**GRAY PANTHERS et al., Appellants,**

v.

**Richard S. SCHWEIKER, Secretary of the Department of Health and Human Services.**

No. 79–1603.

United States Court of Appeals, District of Columbia Circuit.

Argued April 28, 1980.

Decided Oct. 24, 1980.

As Modified on Rehearing March 18, 1981.

Sally Hart Wilson, Los Angeles, Cal., of the bar of the Supreme Court of California pro hac vice by special leave of Court with whom Edward C. King, Washington, D. C., was on the brief, for appellants.

Eugene Tillman, Atty., Dept. of Health and Human Services, Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time of the brief was filed and Robert P. Jaye, Acting Asst. Gen. Counsel, Dept. of Health and Human Services, Washington, D. C., were on the brief, for appellees.

Before WILKEY, WALD and EDWARDS, Circuit Judges.

WALD, Circuit Judge:

This case is a class action brought by the Gray Panthers[1] and three named beneficiaries of the Medicare program challenging the procedures for resolving disputes concerning program benefits of less than $100. The Secretary claims the current notice and "paper hearing" provided by his regulations meet constitutional due process requirements.[2] Appellants contend, however, that nothing less than a full, formal, oral evidentiary hearing, identical to those provided for disputes concerning program benefits of more than $100, will satisfy constitutional due process guarantees. The district court found in favor of the Secretary. 466 F.Supp. 1317. We hold, however, that due process in such disputes requires a procedure that lies somewhere between the two extremes presented by the parties. While we do not find that Congress' elimination of formal hearing[3] rights for disputes over Medicare benefits of less than $100 renders the Medicare Act ("Act") itself unconstitutional, we do find that the appellee Secretary of Health and Human Services' interpretation of the Act presently provides insufficient protection of appellants' due process rights. We accordingly reverse the judgment of the district court and remand the case to it to allow the court, with the assistance of the Secretary and the plaintiffs, to formulate appropriate revisions of the affected regulations which satisfy due process considerations.[4]

1. The Gray Panthers is a national organization which represents elderly citizens. Most of its members are over 65 and the complaint alleged that many members had been denied the procedural rights at issue in this case.

2. The defendant Secretary of the Department of Health and Human Services does not dispute that the claimants' interest in receiving the medical insurance benefits for which they have paid a monthly premium is a property interest, and thus that the requirements of due process attach to any final government decision to deny those payments. The sole dispute in this case is over "what process is due."

3. Since much of the controversy in this case centers on the definition of the phrase "hearing," we wish to make clear at the beginning what we conceive to be the meaning of this term. A "hearing" means *any* confrontation, oral or otherwise, between an affected individual and an agency decisionmaker sufficient to allow the individual to present his case in a meaningful manner. Hearings may take many forms, including a "formal," trial-type proceeding, an "informal discuss[ion]" as mandated by the Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 582, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), for student suspension proceedings, or a "paper hearing," without any opportunity for oral exchange. In the course of this opinion, we will frequently refer to an "oral hearing," "oral process," or "oral communication." We do not mean by use of these terms to suggest that the procedure referred to has any particular characteristic other than being oral in nature. In particular, we do not mean to suggest any equivalency between an oral hearing and a "formal evidentiary hearing."

4. Although much of this opinion focuses on the advantages of providing oral hearings in cases such as this, we do not hold that oral process is always due in Medicare review proceedings.

## DESCRIPTION OF THE MEDICARE PROGRAM

In 1965, Congress passed the Medicare Act, 42 U.S.C. § 1395 *et seq.*, to help assure adequate health care for the elderly. The legislation set up an insurance program to provide reimbursement for the costs of much of the medical care of the aged. Insurance coverage of hospitalization costs, "Part A" of the Act, is funded out of Social Security taxes. "Part B," in contrast, is a voluntary supplemental insurance *program* intended to cover most other health costs, for which a beneficiary pays a monthly premium. The $100 "amount in controversy" limitation on hearing rights challenged here applies to disputes arising under both parts.

The determination and review procedures for claims arising under the two parts of the Act are similar. Both are administered primarily through non-governmental organizations, usually insurance companies, pursuant to contracts with the Department.[5] Claims for payment or reimbursement are submitted to the carrier, which makes an initial determination as to the claim and sends a notice of its action together with any payment to the claimant. If the claimant is dissatisfied, a request for review may be made,[6] and a different employee of the carrier will examine the determination, together with any additional information the claimant may wish to submit, and notify the claimant of the decision on redetermination.

For any claimant whose disagreement with the carrier at this stage does not amount to more than $100,[7] that is the end of the process, according to the Secretary's procedures. There is no further review, and there is at no time an opportunity to present one's case personally to the decisionmaker. If the amount in controversy is *more* than $100, the claimant may request a hearing.[8] Finally, judicial review is availa-

Our extensive discussion of oral hearings stems from the way in which the .parties structured their arguments as to the adequacy of the present procedures for review of small claims, and in particular, appellants' specific claims for relief. However, the appellants argued before both this and the trial court that the need for an oral hearing derived in part from deficiencies in the Secretary's current notice provisions. Our remand to the district court allows the Secretary to propose changes in this as in other aspects of the present paper hearing procedures; the district court may accept these changes as an alternative to oral hearings if it believes they will cure the deficiencies we have noted in the present procedures.

5. These organizations are referred to as "intermediaries" in Part A of the Medicare Act, 42 U.S.C. § 1395h, and "carriers" in Part B, 42 U.S.C. § 1395u. Since the claims of the named plaintiffs in this case happened to arise under Part B, for the most part we will use Part B terminology in this opinion.

6. Reconsideration procedures are set out in 42 CFR §§ 405.710–717 (1979) for Part A claims, and in 42 CFR §§ 405.807–812 for Part B hearings. The procedures appear to be largely the same, except that there is a 60 day statute of limitations under Part A, while a party has six months to file a request for a Part B review. In each case, a claimant may cumulate denials made within that period in an attempt to meet the $100 requirement. A Part A reconsideration is conducted by the Health Care Financing Administration, while a Part B review is performed by an employee of the carrier.

7. 42 CFR § 405.740 sets out the procedures for determining the amount in controversy under Part A, and § 405.820(b) sets out the Part B calculation. Essentially the amount in controversy is the actual amount charged the individual for the goods or services in issue, less any payment which the carrier has made and less any deductible or co-insurance applicable to the particular claim. For example, under Part B there is an annual deductible of $60 and Medicare only pays 80% of most claims. *See* 42 U.S.C. § 1395e (Part A) *and* § 1395*l* (Part B). Plaintiff Keiser was allowed $170 of his $270 claim, and had paid his annual deductible. The amount remaining in controversy is therefore $80, 80% of $100. The issue has not been raised here, and therefore we express no opinion on, the propriety of this formula for determining the amount in controversy.

8. Part A hearings are conducted by administrative law judges while Part B hearings are conducted by the carrier. Carrier-conducted Part B hearings were recently declared unconstitutional by a district court in California because carrier employees could not be impartial decisionmakers and because such proceedings constitute an unlawful delegation of a governmental function. *McClure v. Harris*, 509 F.Supp. 409 (N.D.Cal., 1980). For purposes of this opinion, we assume that, apart from those challenged here, the review and hearing procedures

ble for Part A disputes over $1000; no such review is provided for when the claim arises under Part B.[9]

## THE STATUTE AND THE LEGISLATIVE BACKGROUND

The dispute resolution procedures are an administrative scheme based upon the Secretary's interpretation of the Medicare Act. The statutes provide, in pertinent part: (1) for use of private carriers to handle the bulk of the administration of the program; (2) for the $100 amount in controversy limitation on formal hearings;[10] and (3) for the $1000 threshold for judicial review in Part A claims. The statutes do not mandate that any particular procedures be followed when resolving disputes of less than $100; rather, the Medicare statute itself bars only formal hearings, see note 15 supra, and

poses no absolute statutory barrier to the provision of informal hearing procedures.

As the Medicare bill was first reported out of the House Committee on Ways and Means in 1965, there would have been a $1000 limitation on both formal hearing rights and judicial review, but only as to Part A claims. H.R.Rep.No. 213, 89th Cong., 1st Sess. 47 (1965).[11] When the bill reached the Senate, Senator Edward Kennedy proposed that the amount in controversy requirement be reduced to $100. He emphasized the unprecedented nature of the limitation, the significance of the amounts involved to aged individuals attempting to get by on Social Security benefits and savings, and the value of hearings and appeals in attaining accurate and consistent administration of the new program.[12] His amendment was adopted by

---

now provided for by statute and regulation are in effect and are valid. We express no view on the issues addressed in the *McClure* decision, except insofar as they may be directly involved here as well.

**9.** The validity of this limitation on judicial review is not an issue *per se* in this case, though the existence of a right to vindicate one's rights in court is a relevant consideration in deciding whether a given procedure, as a whole, satisfies due process. Even when no other procedural protections are available, if the courts are open to an individual and able to provide redress, it may be sufficient to satisfy the right to a hearing. *See Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (procedural due process satisfied by availability of common law remedies). The Seventh Circuit, with only brief discussion, has rejected an equal protection attack on the judicial review provisions of the Medicare Act. *Rubin v. Weinberger*, 524 F.2d 497 (7th Cir. 1975). This court, however, has suggested that some access to judicial review may be a requisite element of due process which cannot be wholly denied. *Ralpho v. Bell*, 569 F.2d 607, 619–20 (D.C.Cir.1977).

**10.** *See* note 15 *infra*.

**11.** The Report explained:
(6) *Appeals*
Your committee's bill provides for the Secretary to make determinations, under both the hospital insurance plan and the supplementary plan, as to whether individuals are entitled to hospital insurance benefits or supplementary health insurance benefits and for hearings by the Secretary and judicial review

where an individual is dissatisfied with the Secretary's determination. Hearings and judicial review are also provided for where an individual is dissatisfied with a determination as to the amount of benefits under the hospital insurance plan if the amount in controversy is $1,000 or more. (Under the supplementary plan, carriers, not the Secretary, would review beneficiary complaints regarding the amount of benefits.) Hospitals, extended care facilities, and home health agencies would be entitled to hearing and judicial review if they are dissatisfied with the Secretary's determination regarding their eligibility to participate in the program.
*Id.* at 47.

**12.** When Senator Kennedy introduced his Amendment, he emphasized the following considerations:
Mr. KENNEDY of Massachusetts. Mr. President, under all the laws passed by Congress dealing with public assistance and social welfare Congress has never included any limitation upon the right of a citizen to appeal an administrative decision by the agency involved. In public assistance statutes we have always provided for the right of the beneficiary to question a decision made in his specific case, on the basis that the rules and regulations established to administer such laws cannot account for every possible situation where a real inequity may arise. While it may well be that many appeals will arise under public assistance laws as a result of misunderstanding of the benefits available and their amounts, we have nevertheless considered it important to keep the appeals route open so that valid complaints could be found and heard.

the Senate, and in Conference Committee a compromise was struck, providing for hearings if the amount in controversy was $100 or more, and judicial review for disputes of $1000 or more.

At the time, there were no comparable limitations on Part B claims. So matters stood until 1972, when Congress amended the Act substantially, and in the process extended the limitation on hearings to Part B claims expressly to eliminate the expense and inconvenience of a *formal hearing* when the amount in controversy is small. As explained by the Senate Finance Committee:

> Experience under the program indicates that the holding of a *full fair hearing* is unwarranted in cases where the amount in controversy is relatively small. Carriers have reported cases involving $5 and $10 claims for which the cost of holding a *fair hearing* has exceeded $100. Approximately 45 percent of the hearings held since the beginning of the program have

involved an amount less than $100. Further regulations require carriers to have a reconsideration review of all denied claims. Such review involves different claims personnel than those who acted on the original claim and should be sufficient protection in small claims cases. S.Rep.No. 1230, 92d Cong., 2d Sess. 213 (1972) (emphasis supplied).[13]

As it now stands, review of Part A claims is governed by 42 U.S.C. § 1395ff(b) which provides:

> (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—
>
> \* \* \* \* \*
>
> (C) the amount of benefits under Part A of this subchapter (including a determination where such amount is determined to be zero)
>
> shall be entitled to a hearing thereon . . . and to judicial review of the Secretary's final decision after such hearing. . . .

---

> \* \* \* \* \* \*
> I can fully realize the concerns that the Social Security Administration may have over the number of cases that may arise under this new statute, but I am convinced that until the medicare program has been in operation for some time we should not place administrative ease above the rights of our elderly to question adverse decisions. To the majority of the elderly the amount in question may well involve a substantial part of their income or savings.
> \* \* \* \* \* \*
> Utilization review committees are also provided for in the bill and each hospital must have a review plan. While these wise provisions will be instrumental in controlling the amount of benefits due the patient, there is no doubt that there will be instances of controversy. In fact, Mr. President, it is often the case that the rules and regulations employed to administer such laws are perfected in the long run by the ability of beneficiaries to appeal adverse decisions.
> \* \* \* \* \* \*
> Mr. President, I have asked representatives of the Social Security Administration and other experts to explain the rationale for a $1,000 limitation on beneficiary appeals. The only explanation is one of concern over administrative caseloads as well as concern over the number of cases that may pile up in the courts. I have investigated all the other programs under our social security laws and have not found one instance where a benefi-

ciary's right to appeal has been conditioned upon the amount in question. Under those titles of public assistance where administration is relegated to the States I have found that in each instance it is stated in our laws that the Secretary will only approve a State plan if rights of appeal are provided for, regardless of the amount in question.
> \* \* \* \* \* \*
> These citizens have incomes of only $2,000 a year; a disagreement in benefits of only $200 represents 10 percent of their income. Should they not be able to appeal in this situation involving so much of their income? Could it not be true that the most equitable and worthy case may be one involving only $150?
> I hope that this measure will not be passed with such a built-in inequity. I feel that if experience shows us that the administrators of the program do meet an exceptional caseload, we could place a limit on appeals at a later date. But until this is a problem, I am opposed to any provision that places a burden on the elderly rather than on program administrators.
> 111 Cong.Rec. 1536 (1965) (remarks of Senator Kennedy).

**13.** *See also* 118 Cong.Rec. 1026 (1972) (unsuccessful attempt by Senator Ribicoff to amend bill on the floor to reduce amount in controversy limitation on hearings to $25).

(2) Notwithstanding the provisions of subparagraph (C) . . . a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1000.

Administration of benefits under Part B is largely entrusted to the private carriers. 42 U.S.C. § 1395u(b)(3)(C) provides that the contract between the Secretary and the carrier must require the carrier to:

> establish and maintain procedures pursuant to which an individual enrolled under this part will be granted an opportunity for a fair hearing by the carrier, in any case where the amount in controversy is

$100 or more . . . when the amount of such payment is in controversy.

In neither case does the statute explicitly detail what process is due those persons with disputes concerning benefits of less than $100. However, the Secretary does not argue here that the intent of the statute is to eliminate all rights of these people to any process.[14] Rather, he argues that the statute reduces the process due to the minimum constitutional requirements for due process. Therefore, the question is whether the Secretary's current regulations implementing those statutory provisions provide for these minimum requirements; to the extent they do not, the regulations must be deemed to violate the intent of the law and must be overturned.[15]

14. *See* note 2 *supra* (Secretary concedes statutory benefit is a property interest protected by due process clause).

15. A "due respect for the coordinate branches of government" makes courts reluctant to declare Congressionally-enacted statutes unconstitutional. *Califano v. Yamasaki*, 442 U.S. 682, 692–93, 99 S.Ct. 2545, 2553–2554, 61 L.Ed.2d 176 (1979). The Supreme Court has accordingly adopted the rule that "if 'a construction of the statute is fairly possible by which [a serious doubt of constitutionality] may be avoided,' a court should adopt that construction." *Id.* at 693, 99 S.Ct. at 2553 (*quoting Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)) (citation omitted). This rule is particularly applicable to cases involving due process challenges; the Court has been "willing to assume a Congressional solicitude for fair procedure, absent explicit statutory language to the contrary." *Id.*

The explicit language of the statute challenged here does not prohibit constructions consonant with the due process clause. Though the statute for Part A claims does not provide for any particular process for claimants of less than $100, neither does it prohibit any. Rather, the statutory language is silent on the subject of what process is due. The statute regulating Part B claims, on the other hand, specifically eliminates "hearing" rights for claims of under $100. However, the legislative history makes clear that even in the latter case, the Congressional ban was a limited one.

Congress clearly meant to eliminate the right to a "full fair hearing." *See* text at note 13 *supra* (Senate Finance Committee report). However, "fair hearing" appeared to be a term of art within HEW at that time; the agency repeatedly used the same phrase in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), to describe the formal, evidentiary post-termination hearings held in welfare cases. Thus, a Congressional intent to eliminate the right to a "hearing" may merely be equivalent to an intent to deny rights to a "full fair hearing," rather than to all possible hearing procedures.

Indeed, the Senate report suggests that the more limited interpretation of its intent is the correct one in this case. The Committee justified its amendment eliminating statutory hearing rights for claims of under $100 by pointing to the existence of regulations requiring a more limited, written procedure—the procedure being challenged here—and opining that it "should be sufficient protection in small claims cases." S.Rep.No. 1230, 92d Cong., 2d Sess. 213 (1972). Thus, even as it was eliminating the statutory right to a full hearing, the Committee reaffirmed small claimants' rights to an informal procedure capable of adequately protecting their due process rights. While we disagree with the Committee's evaluation of the adequacy of the limited hearing provided for by those regulations, we do not doubt that Congress intended that adequate procedures be provided.

Thus, it appears that the explicit statutory language forbids only "fair hearings." Since we find that constitutionally required due process is far less extensive than what has been traditionally held to constitute a "fair hearing," this court will conclude, pursuant to the Court's mandate in *Yamasaki*, that the Medicare Act itself is constitutional because we can "assume a congressional solicitude for fair procedure."

## THE CASE HISTORIES OF THE NAMED PLAINTIFFS

### A. *Plaintiff Patino*

Wilma Patino suffers from rheumatoid arthritis. In February of 1976, she fell on ice, and had to undergo a four-month series of treatments, 13 in all, for which she was billed $10 per visit. Her first application for Medicare benefits covered eleven of those treatments; her second covered the final two.

A few weeks after submitting her claims she received partial payment on her first application. Nationwide Mutual Insurance Company, the carrier for her region, approved payment in full for the first seven of her treatments, and wholly disallowed payments for the next four, with the noted explanation that "Medicare does not pay for: This many services for your condition." Shortly thereafter, she received her second communication from Nationwide concerning her second application covering her final two treatments. As an example of the type of notice received by Medicare beneficiaries, we set out in the margin the form utilized by Nationwide in explaining its action to Patino.[16] On her second submission, Nationwide *approved* payment for the services rendered, but only in the amount of $8.25 per treatment. She was directed to "Item 5 on back" for an explanation of why she had not received full compensation. According to Item 5, a preprinted paragraph on the back of the form, the carrier had determined *either* that her doctor did not customarily charge that much, *or* that the $10 charge was greater than most area physicians would have charged. The form does not specify which was the case here.

16. This is a facsimile, with certain unnecessary details omitted, of the form sent to Patino. All forms used by carriers are similar in layout and information included.

EXPLANATION OF MEDICARE BENEFITS

FOR THE CLAIM RECEIVED ON:

06/21/76

PATIENT'S NAME
*Wilma I. Patino*
HEALTH INSURANCE CLAIM NUMBER

CONTROL NUMBER

THIS IS A STATEMENT OF THE ACTION TAKEN ON YOUR MEDICARE CLAIM
KEEP THIS NOTICE FOR YOUR RECORDS

ALWAYS USE INFORMATION IN BOX WHEN WRITING ABOUT THIS CLAIM

| PROCEDURE CODE | 1 SERVICES WERE PROVIDED BY | NO OF SERVICES | 2 WHEN | 3 AMOUNT BILLED | 4 AMOUNT APPROVED | 5 EXPLANATION OF ANY DIFFERENCE BETWEEN COLUMNS 3 & 4 MEDICARE DOES NOT PAY FOR |
|---|---|---|---|---|---|---|
| 9004 | Shearer | 01 | 04 27 76 | 10 00 | 8 25 | See Item 5 on back |
| 9004 | Shearer | 01 | 05 04 76 | 10 00 | 8 25 | See Item 5 on back |
| | | TOTALS | | 20 00 | 16 50 | |

| | | | |
|---|---|---|---|
| AMOUNT PAYABLE AT 80% AFTER THE ANNUAL DEDUCTIBLE | 16 50 | MEDICARE PAID | Please be sure to read the INFORMATION ON THE BACK OF THIS NOTICE |
| AMOUNT APPLIED TOWARD ANNUAL DEDUCTIBLE | 0 00 | | |
| BALANCE PAYABLE AT 80% | 16 50 | 13 20 | YOU HAVE MET $60.00 OF YOUR DEDUCTIBLE FOR 19 |
| REMARKS | TOTAL MEDICARE PAYMENT | 13 20 | PAID TO *Wilma Patino* |

*Thank you for sending your claim promptly. This helps us process your claim faster and more accurately.*

On the back of the form, additional information was provided:

Patino sought review, submitting a letter from her doctor that the number of treatments was not excessive, considering her age and condition, but Nationwide reaffirmed its initial determination. On her request for a hearing, she was notified by letter that since, after subtracting the deductible, the amount in controversy was only $32,[17] she had no right to a hearing, and the determination on review was final. This letter dealt only with her hearing rights (or, more accurately, the lack thereof); it gave no information regarding the reasons for the carrier's denial of her underlying claims.

### B. Plaintiff Keiser

In 1976, Louis Keiser underwent surgery, and received a bill from the anesthesiologist for $270. Keiser submitted his claim to his regional carrier, Blue Cross/Blue Shield of New York, which allowed only $170 of his claim. Keiser requested review and submitted additional documentation from the hospital, but Blue Cross confirmed its earli-

---

ALWAYS GIVE YOUR HEALTH INSURANCE CLAIM NUMBER WHEN WRITING ABOUT YOUR CLAIM. BRING THIS NOTICE WITH YOU IF YOU INQUIRE AT A SOCIAL SECURITY OFFICE.

1. IMPORTANT – YOU CAN USE THIS NOTICE:

   a. To show your physician or supplier how much of the annual deductible you have met as of the date of this notice.

   b. As a record of bills paid or denied. (If you sent in other medical expenses not shown on this form, you will get a separate notice.)

   c. To collect other insurance. If you have other health insurance, you may use this notice to claim the benefits from your private insurance policy. Since your private insurance company may keep this notice, you may wish to keep a record of this information or ask your insurance company for a photocopy.

2. IF YOU NEED MORE INFORMATION:

   a. Check your Medicare Handbook;

   b. Contact a Social Security Office; or

   c. Contact (carrier name, address, phone).

3. TIME LIMIT FOR FILING CLAIMS:

   | For Services Received | File Claims By |
   | --- | --- |
   | Oct. 1, 1970–Sept. 30, 1971 | Dec. 31, 1972 |
   | Oct. 1, 1971–Sept. 30, 1972 | Dec. 31, 1973 |
   | Oct. 1, 1972–Sept. 30, 1973 | Dec. 31, 1974 |
   | Oct. 1, 1973–Sept. 30, 1974 | Dec. 31, 1975 |

   Where a person could not file his claim within these limits because of an error or delay of the Social Security Administration or of a Medicare carrier or intermediary, the time limit may be extended if the claim is filed within 6 months after the error is corrected.

4. HOW MUCH DOES MEDICARE PAY

   Medicare pays 80% of the charges in Column 4 above the annual deductible. The annual deductible is now $60. For calendar years before 1973 it was $50.

   Medicare pays 100% of the charges in Column 4 for radiology and pathology services from physician while you are a bed patient in a qualified hospital.

5. IF PAYMENT NOT BASED ON THE FULL AMOUNT BILLED

   The amount Medicare may pay under law is limited to the lowest of:

   a. Customary charge, i.e., the charge made by the physician or supplier in 50% of his billings during the base year.

   b. Prevailing charge, i.e., the charge made 75% of the time by other physicians or suppliers for similar services in the area during the base year.

6. YOUR RIGHT TO REVIEW OF THE CASE

   If you have a problem or question about the way your claim was handled or about the amount paid, please get in touch with the carrier (name and address) within 6 months of the date of this notice.

   The Social Security Office will help you file a request for review of your claim if it is more convenient.

---

17. See note 7 supra (explanation of how the amount in controversy is determined).

er reduction of the bill, notifying Keiser that the doctor's "customary fee" was $170. Keiser's subsequent request for a hearing was denied, again by a letter similar to that received by Patino, because the amount in controversy, after subtracting the deductible, was $80.

### C. *Plaintiff Rothfeld*

In 1975, Jack Rothfeld, suffering from glaucoma and cataracts, was treated by two physicians at a clinic in Boston. He received two bills, in the amounts of $140 and $150. The services were covered by his Part B supplemental Medicare policy, so he submitted his claim for reimbursement to Blue Shield of Massachusetts, the Medicare carrier for his region.

A few weeks later, Rothfeld received a form, nearly identical to the one received by Patino, entitled "Explanation of Medicare Benefits." Apparently assuming that the treatment had been for only one eye, Blue Shield paid only $140 of his $290 claim. The "explanation" for this determination was limited to the same "Item 5" on the

back of the form indicating that the bills submitted by Rothfeld were either higher than his doctor's customary fee, or higher than the fees usually charged in the area for similar services.

Upon Rothfeld's request for review, in which he pointed out that his treatment covered both eyes, Blue Shield adjusted his claim by $50. It sent him a second Explanation of Medicare Benefits form indicating the upward adjustment in benefits made; the form did not indicate in any way the reason for the denial of the balance of Rothfeld's claim. He requested a hearing as to whether the denial of the balance of his claim was proper but, since the amount in controversy was not $100, Blue Shield sent him a letter denying his request.

## POSITIONS OF THE PARTIES AND THE OPINION OF THE DISTRICT COURT

■ We are thus presented with a case in which the Government has taken *final adjudicatory*[18] action against the plaintiffs, de-

---

**18.** At all times in this opinion, we are speaking of due process procedural rights in the context of an adjudicatory determination; *i. e.*, a particularized inquiry which will determine the legal rights and liabilities of a specific individual. While, of course, due process considerations come into play when the Government makes a variety of other sorts of determinations, such as agency rulemaking, *see, e. g., International Harvester Co. v. Ruckelshaus*, 478 F.2d 615 (D.C.Cir.1973), rights to procedural protections are at their height in adjudicatory proceedings. Historically, a distinction has been made between determinations of "adjudicatory" facts, which require hearings as a matter of due process, and "legislative" facts, which normally do not, though the line between the two is by no means bright. Generally, however, the broader and more prospective the Government's proposed action is, the fewer procedural protections need be ensured to each individual affected. Justice Blackmun, concurring in a recent decision holding that individual residents in a nursing home need not be provided hearings in a Medicare decertification proceeding, relied heavily on this distinction and explained some of the reasons for its existence:

> That the asserted deprivation of property extends in a nondiscriminatory fashion to some 180 patients also figures in my calculus. See *Dent v. West Virginia*, 129 U.S. 114, 124 [9 S.Ct. 231, 234, 32 L.Ed. 623] (1889)

(legislation comports with due process if, among other things, "it be general in its operation upon the subjects to which it relates"). "Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole." *Bi-Metallic Co. v. Colorado*, 239 U.S. 441, 445 [36 S.Ct. 141, 142, 60 L.Ed. 372] (1915).... When governmental action affects more than a few individuals, concerns beyond economy, efficiency, and expedition tip the balance against finding that due process attaches. We may expect that as the sweep of governmental action broadens, so too does the power of the affected group to protect its interests outside rigid constitutionally imposed procedures. Moreover, "the case for due process protection grows stronger as the identity of the persons affected by a government choice becomes clearer; and the case becomes stronger still as the precise nature of the effect on each individual comes more determinately within the decisionmaker's purview. For when government acts in a way that singles out identifiable individuals—in a way that is likely to be premised on suppositions about specific persons—it activates the special concern about being personally *talked to* about the decision rather than simply being *dealt*

termining admitted property rights against them, without at any time in the process providing them more than the sketchiest of notice and a "paper hearing" conducted by carrier employees. In the cases presented, none of the plaintiffs received any precise indication as to why his or her claim was being denied prior to the final decision on review. The positions of the parties are simply stated. The plaintiffs argue that the historical core of due process, adequate notice and the right to a hearing, are fundamental procedural rights which cannot be denied, absent emergency, by the Government in *any* case when a property or liberty interest which is not *de minimis* is at stake.[19] The timing of these rights and additional procedural protections to which an individual might be entitled may vary substantially depending on the stake involved and the Government's interest in efficient, inexpensive administration, but those core procedural rights of notice and an oral hearing, however informally provided, may not be wholly denied.[20]

In addition the plaintiffs argue that the notice provided to individual claimants is so cryptic, and the information it contains so unhelpful, that it is virtually impossible ef-

fectively to gather documentary evidence to submit in writing in order to rebut the carrier's initial determination. Furthermore, individuals of advanced age who are confused about their benefits are unlikely to be able to prepare an effective written submission though they might be fully capable of explaining their concerns in person, given a chance to talk to the decisionmaker. Finally, the plaintiffs point out that approximately 50 percent of the formal hearings that are held on claims over $100 result in adjustments of benefits in the claimant's favor; therefore, they contend, it is clear that a substantial number of errors remain, even after the redetermination procedure, which would be corrected by further oral hearings.

The Secretary agrees that due process dictates the procedures he must follow in making his determinations, but argues that the right to any particular procedural safeguard is determined by the "flexible" due process test enunciated by the Supreme Court in *Mathews v. Eldridge*.[21] This test calls for a weighing and balancing of three factors:

First, the private interest that will be affected by the official action; second,

*with."* L. Tribe, American Constitutional Law, § 10–7, pp. 503–504 (1978) (emphasis in original). I agree with this general statement and find its "flipside" informative here. *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 799–800, 100 S.Ct. 2467, 2482–83, 65 L.Ed.2d 506 (1980) (footnotes omitted).

**19.** The *size* of the interest at stake does not determine whether due process attaches to adjudications concerning the interest, the question is rather the *type* of interest involved and whether it can properly be classified as a liberty or property interest. However, if the amount at stake is truly *de minimis* procedural rights can be dispensed with altogether. *Goss v. Lopez*, 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975).

The notion of a *de minimis* interest which is so insubstantial as to justify dispensing with due process altogether is rightly a narrow one, however, and the Secretary does not rely on it here. When monetary interests are at stake, the doctrine has been limited to matters involving a few dollars or less. *See Northern v. Nelson*, 448 F.2d 1266 (9th Cir. 1971) (claim for damages of $1.05 properly dismissed as *de minimis*). Even in these inflationary times, the loss of sums of up to $100 to people trying to

live on retirement incomes is not only not *de minimis*, but may indeed be a grievous loss.

**20.** In their complaint, the plaintiffs also alleged that the statute and administrative practice violated the equal protection clause because similarly situated beneficiaries—raising identical factual and legal issues—were treated differently solely on the basis of the size of their dispute. The district court held that the "rational basis" test applied, *see Williamson v. Lee Optical of Okl., Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955), and that the distinctions, drawn to reduce the financial burdens on the Medicare program and the courts, clearly had a rational basis. The plaintiffs have not sought review of that portion of the district court's ruling.

**21.** *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), held that Social Security disability benefits could be terminated without first holding an oral hearing when a formal evidentiary hearing would be available at a later stage in the process and any wrongfully withheld sums would be paid retroactively.

the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903. When judged by this test, the Secretary contends, the value of oral hearings in this situation is outweighed by their costs.

The Secretary disputes the alleged inadequacy of the notice, pointing out that the form includes a telephone number to call if the claimant has a problem or question. The Secretary does not argue, however, that the claimant is given any right to speak directly with a decisionmaker about his claim; indeed, the record belies any such contention.[22]

The confusion that can be engendered by statistics [23] was demonstrated when the Secretary responded to plaintiff's statistical argument with the fact that the "reversal rate" is less than one-tenth of 1 percent. This figure was arrived at by comparing the number of reversals to the total number of all denials of benefits, over 15 million in 1976 alone. This, he claims, shows an impressive record of accuracy and no need for further procedural safeguards. The Secretary also contends that most errors are coding or processing errors, not the sort of factual disputes which a hearing is best suited to correct.

The district court's analysis essentially followed the position taken by the Secretary. First noting that due process is not a fixed technical concept, but is a flexible notion of fair procedure that requires such protections as the particular situation demands, the court went on to conclude that even though the law was clear that "some kind of hearing is required at some time" before a person can be finally deprived of a property interest, that "hearing" need not be an "oral, evidentiary proceeding" but could be simply an opportunity to submit written material. To decide whether this limited "paper hearing" was sufficient in this case, the court applied the *Eldridge* balancing test.

It concluded first that while there might be "genuine hardship" in some cases, the amounts of money involved are not large and the Medicare program is not based on financial need. Therefore, as a general matter the private interest at stake is not substantial.

As for the "risk of erroneous deprivation" and value of additional procedural safeguards, the second factor in the *Eldridge* test, the district judge agreed with the positions advanced by the Secretary. He observed that "witness credibility and veracity" are rarely in issue in Medicare proceedings, and concluded that hearings would therefore serve little purpose. He agreed that the Secretary's method of calculating the risk of error more accurately reflected the adequacy of the protection offered by the reconsideration process, and regarded the form of notice as at least clear enough to enable a dissatisfied claimant to pursue the matter further.

The district court finally turned to the governmental interests at stake. The estimates of the cost of the present formal evidentiary hearing provided for over-$100 disputes varied from a low of $196 for a Part B hearing to a high of $405 for a Part A hearing. Furthermore, it was assumed that providing *full evidentiary hearings* for small claims would nearly double the number of hearings held.[24] Although the court

---

**22.** *See* Appellee's Petition for Rehearing and Suggestion for Rehearing En Banc at 2 ("No opportunity to present evidence or argument orally is available.").

**23.** For this very reason, the court in *Eldridge* refused to place much weight on statistical reversal rates, noting that "[b]are statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process." 424 U.S. at 346, 96 S.Ct. at 908.

**24.** In 1972, when the amendments were passed eliminating formal hearing rights for under-$100 Part B disputes, approximately 45 percent of the hearings held involved less than $100. S.Rep.No. 1230, 92d Cong., 2d Sess. 213 (1972). In spite of inflationary pressures, it is undisput-

did not consider the possibility of oral hearings that do not involve full evidentiary proceedings, or the possibility that better written notice might greatly improve the efficacy of paper hearings, it nevertheless concluded that "it is clear that the aggregate additional cost in terms of money and administrative burden in implementing hearings for all claims would be substantial." [25]

In sum, the district court agreed with the Secretary that the "speculative benefit of a right to an oral, evidentiary hearing to persons with Medicare claims of less than $100 is outweighed by the cost to the public of requiring the additional procedural safeguard." Mem.Op. at 17; J.A. 216.

## THE LEGAL UNDERPINNINGS

The underlying dispute in this case is over the definition of the phrase "notice and hearing." The Secretary does not dispute, and indeed could not dispute, that the claimants here have the right to "notice and hearing" on their claims, Brief for Appellee at 21; the principle is so ingrained in our notion of due process that it was described most recently by the Supreme Court as a "general due process maxim." *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 780, 100 S.Ct. 2467, 2473, 65 L.Ed.2d 506

(1980).[26] Indeed, the Secretary cites for us the much-quoted language of *Wolff v. McDonnell*, 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975–2976, 41 L.Ed.2d 935 (1974), pointing out that "some kind of hearing is required at some time before a person is finally deprived of his property interests." The Secretary contends, however, that the Explanation of Medicare Benefits ("EOMB") form, together with the opportunity to submit written materials, constitute an adequate "opportunity to be heard." The problem is thus definitional. When the Supreme Court has said, so emphatically and repeatedly, that "some kind of hearing" is required before a person may be finally deprived of a property interest, did it contemplate that this sort of abbreviated notice and hearing would suffice in these circumstances? We conclude that it did not. While we do not believe the plaintiffs are entitled to the same "full fair hearing" provided for those with disputes of over $100, we find that due process requires a procedure that provides more of an opportunity to be heard than the present notice and paper hearing procedures allow. For this reason, we disagree with the balance reached by the district court under the *Eldridge* test, and are accordingly compelled to reverse its decision.

In the course of its decision, the Court contrasted the interest involved with that at stake when monetary benefits are denied under the Medicare program:

> In the Medicare and the Medicaid programs the Government has provided needy patients with both direct benefits and indirect benefits. The direct benefits are essentially financial in character; the Government pays for certain medical services and provides procedures to determine whether and how much money should be paid for patient care. The net effect of these direct benefits is to give the patients an opportunity to obtain medical services from providers of their choice that is comparable, if not exactly equal, to the opportunity available to persons who are financially independent. *The Government cannot withdraw these direct benefits without giving the patients notice and an opportunity for a hearing on the issue of their eligibility for benefits.*
> 447 U.S. at 786, 100 S.Ct. at 2476 (emphasis supplied).

ed by the plaintiffs that a substantial number of hearings would be requested by those with small claims at stake. Of course, there is no way of predicting how many of these hearings could be eliminated by providing better notice at the outset of the dispute.

**25.** *Gray Panthers v. Califano*, 466 F.Supp. 1317, at 1325 (D.D.C.1979) ("Mem. Op."); Joint Appendix ("J.A.") at 216. Note that the court, like Congress, was operating under an "all-or-nothing" rationale. *See* p. 172 *infra*.

**26.** The issue in *O'Bannon* was whether residents of nursing homes have a due process right to participate in hearings terminating the certification of the particular home in which they live as an approved provider of nursing care under the Medicare program. The Court held that the residents had neither a liberty nor property interest in the continued certification of the facility, in spite of the fact that decertification would mean that they would have to move. *See* note 18 *supra*.

## A. The Value of Oral Hearings

The appellants' major criticism of the Secretary's current procedures is their failure to include any opportunity for an oral hearing. While we do not rule that the Secretary must always provide an oral hearing in under-$100 cases in order to meet due process requirements, we do find that the district court, and the agency, failed properly to weigh the interests to be balanced or properly to acknowledge the full extent of the precedential and policy reasons for providing better notice and/or some form of oral hearing in Medicare disputes, including situations like those involving some of the named plaintiffs here. They also failed to recognize the benefits and the minimal costs of *informal* oral hearings and they seriously underestimated the inadequacy of the notice here to inform a claimant why benefits were being denied. These failings taken together necessarily undercut the correctness of the court's overall balance and require its reexamination of what procedures are necessary to assure adequate notice and a genuine opportunity to be heard.

### 1. Due Process Precedents

To date, the Supreme Court has never expressly approved as meeting due process hearing requirements a procedure in which a claimant has been finally deprived of the right to government benefits without affording that individual an opportunity to appeal personally and orally to the decision-maker. On the other hand, it must be recognized that claimants have been denied through suspensions the value of the use of such benefits for varying periods of time pending a final decision without opportunity for oral exchange. In this way the Court has in effect permitted a decision to be made without an oral hearing as to which party should pay the costs of delay inherent in the decision-making process.

In *Londoner v. City of Denver*, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), for example, the Court explicitly rejected the proposition that an opportunity to submit written comments satisfied the due process requirement of a hearing before tax assessments were finalized as to individual property owners. More recently in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),[27] the Court disapproved as inadequate due process a "paper review" prior to suspension of welfare benefits pending a full evidentiary hearing on the merits of their permanent termination. The Court pointed out some of the underlying practical reasons for insisting on oral process:

> Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important.

*Id.* at 269, 90 S.Ct. at 1021.

Nonetheless, the *Eldridge* Court in ruling out the necessity for an oral hearing prior to suspension of disability benefits acknowledged that at least in some situations, written hearing procedures can be structured to overcome the problems set out in *Goldberg*. See 424 U.S. at 345–46, 96 S.Ct. at 907–908. At the same time, the *Eldridge* Court did not exclude the possibility that in some situations, or without the presence of compensating safeguards, an oral hearing might be a due process requirement.

Moreover, in several recent decisions discussing hearing rights in an adjudicatory proceeding, the Court found that circumstances warranted some type of oral hearing. For example, *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), involved a challenge to a municipal utility's procedure for terminating service for non-payment of bills. The Court held that the "hearing" mandated by due process required, at a minimum, an "opportunity for a meeting with a responsible employee empowered to

---

**27.** *See* 2 K. Davis, Administrative Law Treatise § 12:3, p. 412 (2d ed. 1979).

resolve the dispute." *Id.* at 18, 98 S.Ct. at 1565. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1976), required that before suspending a student for alleged misconduct, "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740. The Court emphasized that no elaborate, formal procedure was required: "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.* at 582, 95 S.Ct. at 740.

Very recently, in *Parham v. J. R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), the Court refused to conclude that a formal, adversary hearing was required in order to institutionalize a child for mental health care but nevertheless held that there must be a personal interview with the child.

[S]ome kind of inquiry should be made by a "neutral factfinder" to determine whether the statutory requirements for admission are satisfied. That inquiry must carefully probe the child's background using all available sources, including, but not limited to, parents, schools, and other social agencies. *Of course, the review must also include an interview with the child.* It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission.

*Id.* at 606–08, 99 S.Ct. at 2506 (citations omitted; emphasis supplied).

*Parham* was followed by *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), in which Social Security recipients challenged the Secretary's reliance upon non-oral hearing procedures prior to undertaking recoupment measures (consisting of reductions in future benefits) for past overpayments of Social Security and disability benefits. Full evidentiary hearings were available only after the recoupment measures were instituted. The relevant statute, § 204(b) of the Social Security Act, commanded that:

there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience.

The Secretary provided written review procedures both for initial adverse overpayment and recoupment decisions. Though the Court upheld the paper review of the overpayment decisions, describing them as "relatively straightforward matters of computation ... based on earnings reports [the claimants] themselves submitted," 442 U.S. at 696, 99 S.Ct. at 2555, the Court pointed out that "written review hardly seems sufficient to discharge the Secretary's statutory duty to make an accurate determination of waiver under § 204(b) ... [because it] '... is inherently subject to factual determination and adversarial input.'" *Id.* at 696, 99 S.Ct. at 2555 (citation omitted).

The list could go on; as we pointed out above, the Supreme Court has thus far not expressly upheld [28] any process finally dis-

---

**28.** *University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), at first blush might seem to qualify because of its holding that a hearing is not required when a student is expelled from professional school for academic reasons, even though the student's interest in remaining in school may be regarded as a liberty or property interest. However, the Court relied heavily on the fact that the student participated in a months-long inquiry into her academic performance, with numerous meetings and discussions with those faculty members who would be making the decision as to her continuation at school, and received ad-

vance notification both of her perceived shortcomings and what would be expected of her were she to be permitted to continue. *See* 435 U.S. at 92, 98 S.Ct. at 956 (Powell, J., concurring); *id.* at 96, 98 S.Ct. at 958 (White, J., concurring); *id.* at 97, 98 S.Ct. at 958 (Marshall, J., concurring); *id.* at 108, 98 S.Ct. at 964 (Blackmun, J., concurring). As Justice White pointed out:

As I see it, assuming a protected interest, respondent was at the minimum entitled to be informed of the reasons for her dismissal and to an opportunity personally to state her side of the story. Of course, she had all this,

posing of a liberty or property claim [29] that provided no opportunity for an oral personal exchange at any point in the process. Many cases require far more,[30] some permit the hearing to be postponed in favor of prompt administrative action,[31] but in each case it was provided at some point.

## 2. The Policy Interests

The tendency to require oral hearings has become so automatic that judicial opinions often devote little discussion to the reasons why our society adheres, in this day of computers and sophisticated print media, to the notion that a right to a personal oral exchange can be a critical element of justice. There seem to be at least three societal goals served by an oral "kind of hear-

ing," *Wolff v. McDonnell, supra,* 418 U.S. at 557, 94 S.Ct. at 2975, the desire for accuracy, the need for accountability, and the necessity for a decisionmaking procedure which is perceived as "fair" by the citizens. Most often mentioned by the courts is the notion that an oral hearing provides a way to ensure accuracy when facts are in dispute, especially if credibility is an issue. Justice Frankfurter believed that "no better instrument has been devised for arriving at truth" than the notice and hearing requirement. *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Even if credibility is not likely to be directly in issue, personal, oral hearings are an effective way to elimi-

and more. I also suspect that expelled graduate or college students normally have the opportunity to talk with their expellers and that this sort of minimum requirement will impose no burden that is not already being shouldered and discharged by responsible institutions.

*Id.* at 97, 98 S.Ct. at 958.

Moreover, the majority decision emphasized the historical deference paid to schools in making academic determinations, and its view that hearings were particularly inappropriate in making a decision as to academic achievement, a "subjective and evaluative" determination. Such considerations, of course, are not involved here.

**29.** The appellee conceded at oral argument that no Supreme Court decision had ever held that a final adjudicatory determination could be made without providing an opportunity for an oral hearing. He invites us to take this unprecedented step, however, referring us to two *rulemaking* cases, *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972), and *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973), which held that in a rulemaking proceeding, the opportunity to submit written materials may satisfy a *statutory* hearing requirement. We note that in his decision in *Florida East Coast,* Justice Rehnquist *expressly relied* upon the distinction between rulemaking and adjudication.

[Our cases have] established that there was no across-the-board constitutional right to oral argument in every administrative proceeding regardless of its nature. While the line dividing them may not always be a bright one, these decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards on

the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.

410 U.S. at 245, 93 S.Ct. at 821.

**30.** *See, e. g., Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation hearing must include impartial decisionmaker, notice, opportunity to appear and speak on own behalf, right to submit evidence and present witnesses, cross-examination and confrontation unless risk of harm too great, and informal statement of reasons); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prison disciplinary hearing requires notice, opportunity to present evidence and call witnesses unless unduly hazardous, confrontation and cross-examination within discretion of the warden, written statement of reasons). The *Wolff* decision specifically declined to hold that the inmate would be entitled to counsel, concluding that the participation of attorneys would give the proceedings an unduly "adversary cast." *Id.* at 570, 94 S.Ct. at 2981.

**31.** *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (temporary deprivation of disability payments pending hearing); *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950) (seizure of allegedly mislabeled drugs without hearing upheld when "there is at some stage an opportunity for a hearing and a judicial determination"). The case which goes furthest in this is *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), dealing with the sensitive issue of corporal punishment in schools, which held that the availability of a hearing in a subsequent damages action satisfied due process.

nate misunderstandings and focus issues. Ambiguities which are not readily apparent on the face of a document can be disclosed and clarified with a few moments of oral exchange between the individual and the decisionmaker. For example, in *Goss v. Lopez, supra,* one of the plaintiffs had been suspended from school without a hearing after she was arrested at a demonstration. The student conceded that she had been arrested, but testified at trial that she had been swept up in a mass arrest and had engaged in no misconduct. A prior opportunity to explain personally the apparently damning arrest could well have avoided a decision based on incomplete or incorrect facts.[32]

The hearing requirement and many of the additional procedural safeguards that due process may require in particular circumstances also serve as an institutional check on arbitrary or impermissible action. Caseworkers, auditors, parole officers and other initial decisionmakers, if required to meet personally with those whose lives they are touching, and justify, however briefly, their decisions to those who are dissatisfied, are faced with a powerful disincentive to arbitrary action.

> [T]he fair process of decisionmaking that [the requirement of notice and an opportunity to be heard] guarantees works, by itself, to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented.

*Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). An oral hearing requirement thus serves to ensure that decisionmakers recognize that their decisions affect the lives of human beings, a fact that is often obscured by a jumble of papers and depersonalized identification numbers. We can well believe it is easy for an employee processing an application for a small amount of Medicare benefits to shrug his or her shoulders and conclude that benefits should be denied or reduced, without stopping to gather the information necessary to reach that decision accurately. The situation could well be different if the employee knew that the claimant would have the opportunity personally to challenge that determination and seek an explanation. An employee is particularly vulnerable to the temptation if there are strong external pressures to reduce costs, as a district court has recently found exist in the carrier-administered Medicare program, *see* note 8 *supra*; small claims which the employee knows cannot be subjected to the scrutiny of a later hearing would be the most likely to suffer.

We do not believe it unwarranted to recognize that human nature frequently leads to careless and arbitrary action when the decisionmaker can retreat behind a screen of paper and anonymity. The principle that those who govern must be accountable to those whose lives they affect in forms not only our representative system of government, but on a broader scale, forms the very essence of what we expect from the Government in its dealings with us. Providing a personal, oral hearing can be one expression of that principle.

A third and perhaps most important reason for generally insisting upon an oral hearing is that no other procedure so effectively fosters a belief that one has been dealt with fairly, even if there remains a disagreement with the result. Our system of government is founded on respect for, and deference to, the integrity and dignity of the individual. In the Government's dealings with individuals—especially with respect to those individuals' property rights—some mechanism must exist to ensure that those values are left intact, even when action is finally taken against the person. In a society like ours, which operates on the assumption of and relies for its continued stability on respect for our institutions and voluntary compliance with the

---

**32.** Even though accurate fact-finding seems to be the most frequently-mentioned reason for a requirement of an oral hearing, it may be just as important a reason that an oral hearing is perceived by the public as a fair and acceptable way of finding facts.

dictates of the law, it is crucial that its members perceive that their rights and interests are taken seriously and thoughtfully by the officials who are deciding their claims.[33] During an oral hearing, the "Government" loses its nameless, faceless quality and comes into focus as another human being with whom the citizen can speak, present his or her case, and look to for a responsible decision. To quote Justice Frankfurter again, no better way has "been found for generating the feeling, so important to a popular government, that justice has been done." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (concurring).

## B. The Mathews v. Eldridge Balancing Test

■ Despite the impressive number of cases requiring oral hearings as part of due process and the policy reasons supporting such a right, it must be acknowledged that some federal courts [34] and learned commen-

---

**33.** Concern that this value not be overlooked appears again and again in the Court's decisions in a variety of contexts. Most recently, it received expression in the Court's decision that there is a public right to access to trials. As Justice Brennan pointed out in concurrence:

The trial is a means of meeting "the notion, deeply rooted in the common law, that 'justice must satisfy the appearance of justice.' " For a civilization founded upon principles of ordered liberty to survive and flourish, its members must share the conviction that they are governed equitably. *That necessity ...* mandates a system of justice that demonstrates the fairness of the law to our citizens.

*Richmond Newspapers, Inc., v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 2837, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring) (citations omitted).

Interestingly enough, after completing a thorough study of another "mass benefit" program, the Social Security program, the authors of the study expressed similar concerns and stressed the crucial importance of "perceived fairness" of procedures to the success and very survival of the program:

It is our view that public trust in the SSA scheme of social insurance would be undermined significantly were the opportunity for a face-to-face encounter with a demonstrably independent decisionmaker eliminated from the system.

*Summary and Conclusions* to J. Mashaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil, & M. Carrow, Social Security Hearings and Appeals, at xxiv (1978).

**34.** In *Geneva Towers Tenants Org. v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974), individual tenants sought hearings before HUD raised the rent in federally-financed low income housing, but the court held that the opportunity to submit written submissions was sufficient. The determination to be made by the agency was not an individualized, tenant-by-tenant rental rate, but general rents applicable to an entire housing development. When a general determination applies to a number of people, it is more akin to legislative rulemaking than adjudication, and opportunity for written

participation may suffice. *See* note 18 *supra. Lewis v. Hills*, 457 F.Supp. 1112 (E.D.Pa.1978), holding that no hearings were required in the administration of the National Housing Act's repair benefits program, has been vacated as possibly moot due to new review regulations promulgated by HUD. *Lewis v. Hills*, 611 F.2d 464 (3d Cir. 1979).

In *Newsom v. Vanderbilt University*, 453 F.Supp. 401 (M.D.Tenn.1978), the plaintiffs sought a requirement of better and more effective notice of the possible availability of medical benefits to indigent patients brought to hospitals, which were required by law to treat a certain number of needy cases free of charge. The controversy in the case involved the existence of a protected interest and the adequacy of notice; hearing rights do not seem to have been at issue.

After oral argument in this case, the appellee called to our attention the recent decision of the Ninth Circuit in *Mitchell v. Occidental Ins.*, 619 F.2d 28 (9th Cir. 1980), describing it as holding that the present procedures for resolving Medicare disputes under $100 satisfy due process. The plaintiffs had filed a claim for $40 in Medicare payments in small claims court; the defendants removed the case to federal district court, and the Ninth Circuit upheld the district court's dismissal of the action, relying on the $1000 statutory limitation on judicial review and sovereign immunity. In its one page per curiam decision, the court went on to briefly describe the notice and reconsideration procedures, concluding that "[i]n our view these provisions satisfy due process requirements." *Id.* at 30. We regard this decision as less than persuasive precedent because the comment is *dicta*, since the court had already held that it lacked jurisdiction over the plaintiffs' claims, the hearing point does not appear to have been raised by the parties as an issue in the case, and the court's comment is accompanied by neither analysis of the issue nor citation of authority.

*See also* text at notes 38–39 *infra* (discussion of *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir. 1978), *cert. denied*, 442 U.S. 929, 99

tators[35] maintain that there are situations involving final adjudications of rights that do not require oral process. It is suggested that under the Court's more recent enunciation in *Eldridge*, an oral hearing is simply one of an arsenal of procedural safeguards whose worth in any overall process must be determined by the formula, laid down in *Eldridge*, of whether its "probable value" is outweighed by its "fiscal and administrative burdens." 424 U.S. at 335, 96 S.Ct. at 903.

*Eldridge* dealt with the question of what procedural protections are required *before* the Government may stop paying disability benefits which had been provided on a *regular* basis. As here, an intermediary made an initial determination that Eldridge was no longer eligible for benefits, though in the case of disability payments, the intermediary is a state agency rather than a private company acting under contract. The agency notified Eldridge of its tentative determination that his benefits should be terminated. The tentative determination included a statement of reasons and a summary of the evidence on which the agency primarily relied. He was entitled to "full access" to the information relied upon, permitted to respond both initially in writing, and subsequently to submit additional evidence. The decision to terminate was then reviewed by an examiner in the Social Security Administration who once again notified Eldridge of the reasons for his decision, and informed him of his right to *de novo* reconsideration. Again, he had the opportunity to submit additional written material, and receive a decision on reconsideration with specific reasons for the action taken. At that point, his benefits would be terminated. After termination, he was entitled to demand both a full evidentiary hearing and judicial review; if successful at either level he would receive retroactive benefits. However, he would be without remedy for the loss of interest, or interim use of the benefits withheld. The question for decision in that case, then, was whether the denial of a right to a pretermination full evidentiary hearing denied Eldridge his right to a meaningful opportunity to present his case at a meaningful time.

The Court considered the four factors, discussed above, to determine the "identification of the specific dictates of due process": the private interest affected, the risk of an erroneous deprivation of such interest, the probable value of additional or substitute procedural safeguards, and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. 424 U.S. at 334–35, 96 S.Ct. at 902–903. It concluded that, considering the interests at stake, the "not insubstantial" costs of conducting pretermination hearings outweighed their likely benefits in light of the other procedural protections already afforded the claimant. *Id.* at 347–48, 96 S.Ct. at 908–909.

This balancing test has been used subsequently by other courts to determine the necessity for a variety of procedural protections normally associated with an adversary hearing[36] even if it is the only hearing the claimant will ever receive. They have justified this expansive use of the test by citation to the Court's comment at the end of *Eldridge* that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances," 424 U.S. at 348, 96 S.Ct. at 909, as well as by cases such as *Goss v. Lopez, supra,* in which the Court, though holding "some kind of [notice and] hearing" was necessary, recognized that very informal and summary dispute resolution procedures would satisfy due process norms even when liberty or proper-

S.Ct. 2858, 61 L.Ed.2d 296 (1979); pp. 160–161 *supra* (discussion of *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979).

**35.** See 2 K. Davis, *supra* note 27, at § 13:11; Friendly, "*Some Kind of Hearing,*" 123 U.Pa.L. Rev. 1267, 1281 (1975).

**36.** *See, e. g., Basciano v. Herkimer,* 605 F.2d 605 (2d Cir. 1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979).

ty interests are at stake. Professor Kenneth Davis has concluded in the most recent edition of his Administrative Law Treatise that *Goss* and *Eldridge* together may stand for the proposition that "[w]hen a trial is not feasible on an issue of adjudicative fact, a person may have a due process right [only] to a summary of the adverse evidence and a chance to respond informally," with the "feasibility" of additional procedures, including an oral hearing, to be determined by the *Eldridge* balancing test.[37]

Thus courts applying the *Eldridge* balancing test have, on occasion, held "paper hearing" procedures to be adequate where in the total context of the process, they are deemed to ensure adequate notice and a genuine opportunity to explain one's case. For example, in *Basciano v. Herkimer*, 605 F.2d 605 (2d Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979), the Second Circuit upheld New York City's procedures for determining a claimant's eligibility for disability benefits despite the fact that the City did not provide for oral hearings. Instead, the claimant was examined by two different panels of Board doctors, each of which recommended a decision, and he had the opportunity to submit his medical records as well as any other written statements. It bears noting both that the court carefully limited its holding to the case at hand,[38] and that the claimant was not totally denied the opportunity for an "oral hearing" inasmuch as he had the opportunity to converse with those individuals responsible for recommending the decision—the agency's doctors.[39]

*Goss* and *Eldridge*, then, provide in the opinion of some a valid basis for justifying the elimination of traditionally accepted forms of dispensing "due process" such as oral hearings when the costs of those forms outweigh their benefits. But no case or

commentator suggests that traditional trial-type procedural safeguards may be eliminated at the expense of the core requirements of due process—adequate notice of why the benefit is being denied and a genuine opportunity to explain why it should not be. In deciding if the totality of a procedure meets these core requirements of due process, no component of a procedure can be analyzed independently of the others. As Judge Friendly wrote, "if an agency chooses to go further than is constitutionally demanded with respect to one item, this may afford good reason for diminishing or even eliminating another." Friendly, *supra* note 35, at 1279. In particular, he felt that the better the agency's notice procedures, "the more forthcoming the agency has been in disclosing its grounds [for decision], the stronger ... its position in asking curtailment of other procedures." *Id.* at 1281.

Given, then, the fluid and probably still evolving state of the law as to the necessity of oral hearings prior to final determinations of property interests such as these, we do not fault the district court's use of the *Eldridge* balancing test to determine what, if any, additional procedural safeguards are necessary here. We do disagree, however, with its conclusion that the Secretary's present procedures provide adequate safeguards to protect that due process core, as well as with the manner in which it balanced the benefits and costs of the additional safeguards of more adequate notice and/or an informal opportunity to talk to the decisionmaker at some point in the process.

C. *The Requirements of Due Process in This Case*

■ Whether a procedure such as the "paper hearing" employed here contains the "essence of due process ... [by providing]

---

**37.** 2 K. Davis, *supra* note 27, at § 10:1, p. 307.

**38.** In a long footnote, the court rooted its decision in the specific facts of the case as presented by the individual claimant before it, suggested that the result might have been different if the plaintiff had identified a particular issue he wished to explore at an oral hearing, and urged

the City to amend its procedures. 605 F.2d at 611 n.8.

**39.** Prof. Davis nonetheless considered this case to be problematic; in his view, it failed to adequately consider the "perceived fairness" value of an oral hearing. 2 K. Davis, *supra* note 27, at § 12:12.

'a person in jeopardy of serious loss ... notice of the case against him and opportunity to meet it,'" *Mathews v. Eldridge*, 424 U.S. at 348, 96 S.Ct. at 909 (*citing Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. at 171–72, 71 S.Ct. at 648–649), must be decided in the context of the entire dispute resolution process, as well as with reference to the characteristics of the group who have to use it. *See id.* 424 U.S. at 349, 96 S.Ct. at 909. We find serious procedural deficiencies in the current process which could be alleviated in great part by the provision of an opportunity for informal oral consultations, although possibly by other alternate procedures such as better notice as well. Without some additional improvements, however, we are unable to hold that the current procedures meet the due process minimum, and we must order the court to reengage in the *Mathews v. Eldridge* balancing test to ascertain what additional safeguards are feasible and necessary. In doing so, however, it is only fair that we indicate wherein we find its prior balancing at fault.

### 1. *The Private Interest at Stake*

Though the district court recognized that "the denial of Medicare benefits undoubtedly does inflict genuine hardship upon some claimants," Mem.Op. at 7; J.A. 206, it minimized the private interest at stake by drawing upon the Court's distinction in *Eldridge, supra*: "[e]ligibility for Medicare benefits, unlike eligibility for public assistance benefits, is not based upon financial need." Mem.Op. at 7; J.A. 206. We are not so sanguine, however, that the mere difference in eligibility criteria between the two programs is sufficient to support an inference that Medicare recipients do not have a

substantial enough stake in being compensated for necessary medical expenses to warrant a more expansive notice and hearing procedure than that afforded here. The relatively small amounts involved (less than $100) in disputed claims may be misleading. A chronic patient could be denied up to $600 per year under Part A and $200 per year under Part B without qualifying for additional protection,[40] amounts greater than the cut-off point which Congress felt deserving of a full evidentiary hearing, and close to that it found deserving of judicial review.

Nor can we ignore in any evaluation of the "interest at stake" the significant percentage of Medicare claimants disadvantaged by disability, illness and poverty, a substantially higher figure than is true of the population at large. Indeed it was because of the special coincidence of medical needs and financial problems among elderly people that the Medicare program was established in the first place. *See* S.Rep.No. 1230, 92d Cong., 2d Sess. 37 (1972) (group characteristics of "low incomes and high medical expenses ... led Congress to provide health insurance for older people"). That unfortunate coincidence is borne out by current statistics which indicate that the elderly still have lower incomes and higher medical expenses than other segments of the population.[41] Thus, though need is not an eligibility criteria for participation in Medicare, a disproportionately large percentage of elderly recipients hover near the poverty level. Nonreimbursed medical bills of up to $100 represent a substantial loss to them. Although aware that despite evidence submitted to the *Eldridge* Court that disabled workers' families also tended to be

---

40. *See* note 6 *supra*.

41. *Medicare: A Fifteen-Year Perspective: Hearing Before the House Select Comm. on Aging,* 96th Cong., 2d Sess. 10 (July 30, 1980) [hereinafter cited as *Medicare: A Fifteen-Year Perspective*]. Hospital expenses for the over-65 population average three times that of people under 65, yet the majority of the aged live on reduced retirement incomes. *Consequences of Changing U.S. Population: Baby Boom and Bust: Hearings Before the House Select Comm.*

*on Population,* 95th Cong., 2d Sess. 2:659 (June 1, 1978) (testimony of R. Derzon, Health Care Financing Administration administrator). Overall, older persons have one-half the income of their younger counterparts. In 1975, 43 percent of aged couples could not afford the theoretical retirement couple budget prepared by the Bureau of Labor Statistics for a modest but adequate intermediate standard of living. *See* Brotman, "Every Tenth American," January 31, 1977.

on the low end of the income scale, it reached a conclusion that "the potential deprivation [in disability cases] is generally likely to be less than in *Goldberg*," 424 U.S. at 341, 96 S.Ct. at 906, we still feel that the trial court here must give some explicit consideration to the unique disability problems and low economic status of large numbers of aged persons when evaluating their need for protections against unjustified denials of modest medical claims.

Finally, we emphasize that in *Eldridge* the interest at stake was *defined* by the court as "*sole[ly]* [an] interest ... in the *uninterrupted* receipt of this source of income *pending* final administrative decision on his claim," 424 U.S. at 340, 96 S.Ct. at 905 (emphasis supplied), whereas here the interest at stake is a *permanent* loss of benefits. The trial judge found that critical difference between a temporary and permanent loss to be irrelevant. Mem.Op. at 8–9; J.A. 207–08. We believe that the permanency of the loss of benefits sets this case apart from *Eldridge* and enhances the relatively low status of the interest at stake accorded by the district court. We feel the court must weigh the very real differences involved in depriving the claimant in a case like *Eldridge* of the temporary use of benefit monies pending a final decision as to his right thereto against the permanent loss of the reimbursement for medical expenses involved in this case, as well as any temporary loss of the use of that money pending a final determination on review. This situation, unlike *Eldridge*, does not involve only the allocation of the costs of delay in the decisionmaking process, but the permanent loss of the benefits themselves.

### 2. *The Risk of Erroneous Deprivation and the Benefit of Additional Safeguards*

The accuracy of the Secretary's current dispute procedures for claims under $100 was a major source of dispute in this litigation. Each side relied on different statistical measures to measure the reversal rate. All of them are undermined to some degree by what even the agency admits is a deceptively low appeals rate; [42] for a variety of reasons acknowledged by the agency and the district court, including ignorance, confusion and disability, few people challenge adverse claims decisions. At any rate, like the Supreme Court in *Eldridge*, 424 U.S. at 346 n.29, 96 S.Ct. at 908 n.29, we would not feel comfortable in relying too heavily on the elusive statistics proffered by either side to measure the magnitude of the risk of error inherent in the present procedures.

We must therefore rely on our own judgment, bolstered by evidence from Congressional hearings and client surveys, that the notice accorded to the plaintiffs here by the EOMB form, unsupplemented by any opportunity to communicate personally with the carrier employee responsible for the initial denial, does not give constitutionally adequate notice of why benefits are being denied. We agree with the plaintiffs that "the reasons for claims denials given in the initial notice [can be] ... so unclear that it is virtually impossible for the average beneficiary to present a well-reasoned argument to the insurance company." J.A. 94 (Plaintiffs' Memorandum in Support of Motion for Summary Judgment).

Under the Medicare law benefits may be denied either because treatments are deemed unnecessary or because the charges are deemed unreasonable. 42 U.S.C. § 1395x(v). The agency-approved notices [43] received by two of the named plaintiffs here failed to specify prior to the final agency review which of these two basically different causes for denial applied; the claimants were referred only to Item 5 on the back of the form. This item in turn states that either the provider has not charged the "customary charge" or that his

---

**42.** *See* Boston Medicare Bureau Study, Beneficiary Appeals Study, at 2 (1977) (few appeals from non-assigned claims); J.A. 94, 102.

**43.** *See* J.A. 177 (Defendant's Reply to Plaintiffs' Motion for Summary Judgment) ("The form and content of the EOMB [Explanation of Medicare Benefits] are closely prescribed by detailed instructions issued by the Medicare Bureau[.]").

charges are not "prevailing," that is, not in the 75th percentile of his provider peers. It says nothing about whether or why the treatment may be deemed inappropriate, although in plaintiffs Patino's and Rothfeld's cases, the nature of the treatment was apparently the underlying reason for denial, not the "charge," despite the notation on the EOMB form. Thus plaintiffs Patino and Rothfeld were not adequately informed by the "notices" whether their doctors were allegedly more expensive than others in the locality, or were charging them more than other patients, or whether or why the treatments were deemed unnecessary.[44] Plaintiff Patino's confusion was accentuated by the fact that she was given two differing and conflicting reasons for the denial of benefits for identical treatments at different times.[45] Their experiences cannot be dismissed as isolated ones. Congressional witnesses recently testified in a hearing on Medicare that their elderly constituents on a widespread scale experienced similar confusion as to why expected benefits were being denied;[46] a survey cited to the trial judge by the plaintiffs also showed that the average Medicare recipient did not understand from the notice why his claim was denied or what to do about it.[47] Unlike the trial judge, we cannot agree that other factors such as age or disability which impede elderly claimants' efforts to seek reconsideration or review in any way detract from their need for informative notice;[48] in our opinion these other factors only accentuate the need for adequate notice as to the specific basis for denial.

It is universally agreed that adequate notice lies at the heart of due process.[49] Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose—and resembles more a scene from Kafka than a constitutional process. Without notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response and driven

---

**44.** The patient needs to know for which of these reasons his claim is being denied, not only in order to respond but also for his guidance in future relationships with the same physician. The kind of documentation which would be relevant to reply to a charge that he was required to pay more for the same services than other patients of the same physician, *i. e.*, that the charge was not "customary," would be quite different from the kind of proof necessary to refute a denial on the basis that the charge made by his doctor—though evenhanded among his own patients—was not the "prevailing" one, *i. e.*, within the 75% range of customary charges in the catchment area. Still different would be the kind of material necessary to reply to a charge that the treatment itself was inappropriate or unnecessary.

**45.** *See* text at notes 16–17 *supra*. The first notice told Patino that the treatment she had received was unnecessary, and explained why this decision had been reached. If considered alone, this explanation may have been sufficient to apprise Patino of the issue in dispute. Its helpfulness, though, was vitiated by the receipt of the conflicting second notice. One, if not both, of these claims must have been handled incorrectly. However, it was left to Patino to try to puzzle out the inconsistency and prepare an intelligible, appropriate written response.

**46.** *See Medicare: A Fifteen-Year Perspective, supra* note 41, at 55 (testimony of B. Wolman).

Both the Secretary and the district court relied heavily on the role of the physician as interpreter of or respondent to the notices of denial of benefits. *See* Mem.Op. at 12; J.A. 211. However, in at least one-half of the cases, because an ever-fewer percentage of doctors are accepting payment in the form of Medicare assignments, the recipients must respond to the notices themselves. *Medicare: A Fifteen-Year Perspective, supra* note 41, at 6–7 (remarks of Rep. Oakar).

It is true of course that the claimant must usually seek the information with which to respond from the provider-physician. The provider, however, often has no obligation to assist so that the elderly patient has in effect two sets of potential obstacles to overcome: convincing the provider to supply whatever information may be useful in combatting the denial and convincing the carrier to grant the claim on reconsideration. It would be an understatement to say that his need for a precise notice as to why his claim is being denied is a compelling one.

**47.** *See* Boston Medicare Bureau Study, Beneficiary Appeals Study, at 2 (1977); J.A. 94.

**48.** Mem.Op. at 11; J.A. 210.

**49.** *See Federal Trade Comm. v. Carter*, 636 F.2d 781 at 791 (D.C.Cir.1980) (Wilkey, J., concurring).

to responding to every possible argument against denial at the risk of missing the critical one altogether.

It may be that in some circumstances a lack of precise initial notice of the grounds for denial may be compensated for by ready access to the adverse evidence or a summary thereof. For instance, in *Eldridge*, the claimant had such ready access to the decisionmaker's entire file on his case. Moreover, he had the opportunity to talk to the examining doctors. Therefore, he had the opportunity to flesh out the notice of denial and determine from the file and conversations with doctors what factual matters, if any, were in dispute even before the *pretermination* denial. In this case, however, the cryptic notice on the EOMB form is the sum total of the communication from decisionmaker to claimant before a final denial [50] and it comes only *after* an initial denial has already been made. The claimant has no opportunity to flesh out the notice at any stage by access to the files or informal consultation with either the initial or reviewing decisionmaker before a final and irrevocable denial of benefits is made. Because the reconsideration is a "paper one" only, he can only write a letter or get his doctor to write a letter that he hopes will address the issue. The lack of adequate notice is in no way offset by a compensating procedure elsewhere in the process. *Cf. Memphis Light, Gas & Water Div. v. Craft, supra.* We find the risk of erroneous deprivation encountered in such a process to be substantial enough to require a careful assessment of additional protections.

Again we refer to the unique characteristics of the group involved here in order to appraise the accentuated effects of these notice defects. Congress, in enacting and amending Medicare, has repeatedly recognized that the elderly, as a group, are less able than the general populace to deal effectively with legal notices and written registration requirements—Congress itself amended the Medicare Act to automatically include Part A eligibles into Part B because elderly eligibles were failing to enroll due to "inattention or inability to manage their affairs." S.Rep.No. 1230, 92d Cong., 2d Sess. 38 (1972).[51] To countenance granting them less than adequate notice of the reasons for denial of medical benefits would be inconsistent with that Congressional intent, to say the least.

Opportunity for an oral interview or consultation could alleviate some of the problems caused by the inadequate notice, although a conscientious definition of due process would include both specific notice of the factual grounds for denial plus a subsequent opportunity to address these grounds in a way that is accessible to the users of the process. But the chance to talk to someone in charge would at least offer the claimant the opportunity to discover the basis of his dispute with the agency, and, if he has a defense, either answer on the spot or prepare rebuttal material for later submission.

In addition, an oral hearing has an independent value in many reviews of this kind which was not taken into account by the trial judge. Oral hearings are peculiarly suitable to advance factfinding on issues

---

**50.** Though the Secretary pointed to, and the district court cited, the invitation on the form notice to the claimant to call the carrier for further information, it was never contended that calling the number listed on the back of the EOMB form entitled a claimant to talk to anyone with decisionmaking power or even direct knowledge of his claim, nor that it in any way entitled him to see his file or obtain a summary of the evidence against him. *See* note 22 *supra.* Thus, the statement contained on the back of this form does not meet the requirements set out for notice of an informal hearing procedure in *Memphis Light, Gas & Water Div. v. Craft, supra,* 436 U.S. at 14 n.15,

98 S.Ct. at 1563 n.15 ("In essence, recipients of a cutoff notice should be told where, during which hours of the day, and before whom disputed bills appropriately may be considered.").

**51.** It is well known that elderly people are particularly subject to hearing, vision and mobility impairments. Thirty-eight percent of the elderly suffer from arthritis, ninety-two percent wear glasses, and five percent wear hearing aids. Iglehart, *The Cost of Keeping the Elderly Well,* Nat'l J. 1728, 1729 (1978). It may be that offering them a choice of either an oral or paper hearing is the best way to allow meaningful access to the reconsideration procedures.

which depend on the credibility and veracity of the claimant. *See Califano v. Yamasaki,* 442 U.S. 682, 696, 99 S.Ct. 2545, 2555, 61 L.Ed.2d 176 (1979). In Medicare review, despite the Secretary's and the trial judge's emphasis on the "routine" or computational aspects of most denials, issues involving credibility often do arise. For example, the statute and the regulations provide for a waiver of the "reasonable and necessary" test for the payment of assigned claims in certain cases. Specifically, a beneficiary may be reimbursed for any payments made to a provider for treatments deemed not reasonable or necessary if the beneficiary acted under a good faith belief that the expenses were reimbursable. The agency may then recoup these indemnified funds from the provider, but only if the provider did not in good faith believe that the treatments were necessary or appropriate. 42 U.S.C. § 1395pp.[52] As the Medicare Carriers Manual itself recognizes, the interests of

patient and provider in such a situation may be adverse and issues of credibility and veracity are involved. Medicare Carriers Manual, Part 3, Claims Process ¶ 7300.4. The Supreme Court has already held in *Yamasaki* that a determination of a claimant's good faith or fault requires personal contact between claimant and decisionmaker.

[A] written review hardly seems sufficient to discharge the Secretary's statutory duty to make an accurate determination of waiver under § 204(b). Under that subsection, the Secretary must assess the absence of "fault" and determine whether or not recoupment would be "against equity and good conscience." . . . The Court previously has noted that a "broad 'fault' standard is inherently subject to factual determination and adversarial input." *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 617 [94 S.Ct. 1895, 1905, 40 L.Ed.2d 406] (1974). As the Secre-

---

**52.** The Medicare regulations, 42 CFR § 405.330, provide for payment of some assigned claims that are ordinarily nonreimbursable under § 405.310(k) because they are not "reasonable and necessary for the diagnosis or treatment of illness or injury[.]" Reimbursement can nonetheless be made in such cases where "neither the individual nor the provider knew or could reasonably be expected to know that the expenses incurred were excluded under § 405.-310(k)." In addition 42 CFR § 405.331 provides that the individual may be repaid in circumstances where bills have already been paid to the provider if the individual had no reason to know the charges were not covered and the provider did know or have reason to know they were not. 42 CFR § 405.332 sets out the criteria by which the carrier determines whether the individual or the provider should have known the services were not reimbursable; these include whether the claimant had been told by carrier or provider or had relevant past experience with either from which to conclude that the services were not covered. (The individual is presumed not to have such knowledge.) The intermediary carrier's duties as set out in 42 CFR § 405.678(2)(c) include making the determination initially and on reconsideration whether the claimant knew or had reason to know the services were medically unnecessary or clearly improper. *See also* 42 CFR § 405.803(b).

Waiver decisions are always made at the reconsideration level. If a claim may be subject to a waiver provision, an additional notice is printed on the EOMB form: "If you did not know that Medicare did not pay for this medi-

cal service (or item) for this condition, you may request a review of this decision." Medicare Carriers Manual, Part 3, Claims Process ¶ 7005. This notice does not inform the beneficiary of the waiver provision, except by oblique reference. The Manual also allows, but does not require, carrier officials on reconsideration to talk to the individuals involved. *Id.* at ¶ 7300.4.

These waiver provisions are not insignificant. Indeed, in one Medicare carrier branch, 596 of 2023 reviews on reconsideration revealed errors of coverage and waivers of liability as determined by these regulations. J.A. 152 (Exhibit JJ, Analysis of Branch Reports).

*See also* 42 CFR § 405.506 (reimbursement provided for greater than customary or prevailing costs if unusual circumstances or medical complications exist warranting higher charge).

Under Part A (hospital care) the notice of initial denial is to "state in detail the basis for the determination." 42 CFR § 405.703. The notice of the reconsideration decision is also to state the "specific reasons for the reconsidered determination." 42 CFR § 405.716. Under Part B (doctor and other provider services) the carrier is required only to give "written notice of [the initial] determination" along with notice of the right to have the determination reviewed. 42 CFR § 405.804. The review determination "shall state the basis thereof." The regulations thus make no provision for supplementary phone calls, access to evidence or files, or in Part B cases to any detailed statement of the grounds for denial.

tary's regulations make clear, "fault" depends on an evaluation of "all pertinent circumstances" including the recipient's "intelligence ... and physical and mental condition" as well as his good faith. 20 CFR § 404.507 (1978). We do not see how these can be evaluated absent personal contact between the recipient and the person who decides his case. Evaluating fault, like judging detrimental reliance, usually requires an assessment of the recipient's credibility, and written submissions are a particularly inappropriate way to distinguish a genuine hard luck story from a fabricated tall tale. See *Goldberg v. Kelly,* 397 U.S. at 269 [90 S.Ct., at 1021].

442 U.S. at 676–77, 99 S.Ct. at 2555.

Thus, the overriding benefits of an oral hearing where the claimant's good faith belief in the coverage of the services is at issue have already been asserted by the Supreme Court.[53] We cannot, therefore, agree with the trial judge's conclusion here that "the nature of [the reviewer's] inquiry is particularly suited to procedures that afford claimants the opportunity to make written submissions." Mem.Op. at 15; J.A. 214. While the "largest numbers of denials ... [may be] 'reasonable charge reductions' which typically turn upon mathematical calculations," we do not see on what basis he could conclude that most other decisions are " 'sharply focused and easily documented' " by " 'routine, standard, and unbiased medical reports by physician specialists.' " Mem.Op. at 14–15; J.A. 213–14. We can foresee different scenarios in which both the claimants' and the providers' credibility may be at issue and their "interests at stake" not necessarily congruent.

As a final fillip here, we note that the decisionmaker on review is himself an employee of the very private insurance carrier which previously denied the claim. Moreover, this carrier has a financial interest in the outcome of the proceedings. The possibility of bias inherent in utilizing the employees of an interested private party as administrative decisionmakers has led one court to hold the full fair hearings provided claimants of over $100 under Part B violative of due process. The failure to provide an impartial tribunal, the court concluded, rendered the hearing fatally defective. The district court in *McClure v. Harris, supra* note 8, reasoned:

If hearing officers are potentially biased in favor of the carriers whose determinations they review, then the availability of an independent, administrative appeal beyond the hearing officer level might well mitigate the harmful effects of such bias. On the other hand, if no independent tribunal is ever to review a hearing officer's decision, the impartiality must be fully ensured at the hearing officer's level.

503 F.Supp. at 414. Without passing on the correctness of the *McClure* court's ruling, we do find its balancing equation instructive. In weighing the calculus of whatever process is due Part B claimants who are not entitled to a full fair hearing because their claims are under $100, the court should consider both that (1) the decisionmaker has a financial incentive to keep payments low because the Secretary periodically reviews the Department's contracts with private carriers,[54] (2) the decisionmaker on review is an employee of the same carrier as the person who originally denied the claim, and "could only rule in the beneficiaries' favor by directly overturning the carriers' deci-

**53.** Even in cases where the claimant's credibility is not directly in issue, a personal interview between claimant and decisionmaker may ultimately make a crucial difference in the outcome of the dispute over whether the claimant must pay the medical bill. A Social Security Administration study showed face-to-face interviews at the reconsideration stage of disability denials resulted in awards in an additional 20% of cases as compared with those reconsid-

erations done without such interviews. These results, confirmed by a second study, are also consistent with the results of earlier studies made by the agency. Mashaw, *The Supreme Court's Due Process Calculus for Administrative Adjudication in Mathews v. Eldridge: Three Factors in Search of a Theory of Value,* 44 U.Chi.L.Rev. 28, 43 n.55 (1976).

**54.** *See* note 8 *supra.*

sion," *id.*, and (3) there is not only no appeal from the carrier employees' decisions but also no opportunity for direct contact between the claimant and these decisionmakers at any stage of the proceeding.

In sum, we believe the current procedures allotted to the elderly Medicare claimant, probably disadvantaged by disability and poverty, resemble playing against a stacked deck—notice that does not adequately inform him of the basis of the denial, no access to files or a summary of the evidence, no opportunity for any direct oral communication with the decisionmaker, a provider and a decisionmaker with possible bias, no appeal of any sort. This combination results in a significant possibility of deprivation. Our concern is that this combination be altered by the addition of some other protections in a way that will assure a claimant minimal due process, *i. e.*, adequate notice and a genuine opportunity to present his case.

### 3. *Costs of Additional Safeguards*

Our final problem with the trial court's balancing under *Eldridge* is that in weighing the feasibility or costs of additional procedures, it considered only the estimated costs of providing the same full fair hearings for under-$100 claims as are currently provided for over-$100 claims. Since we are interested only in ensuring that a claimant receives adequate notice and a genuine opportunity to answer the factual case against him, whether achieved by means of better notice, opportunity to talk to the decisionmaker and/or see his file, or a combination of both, the cost of these additional procedures, not of full fair hearings, is what is at stake. On remand the court should weigh the much less expensive costs of such informal procedures against their expected benefits.

CONCLUSION

As we believe we have made clear, we hold that, where elderly participants in a federally supported insurance program are permanently denied statutory benefits under that program, the "notice and hearing" requirement of due process mandates that they receive more protection than the present system allows. The present system is flawed by: an inadequate form of notice; a procedure which allows a claimant only a limited opportunity to submit a written reply to an inadequate notice; and a total denial of any opportunity for a claimant to participate in any kind of oral interview or consultation with an individual knowledgeable about and empowered to resolve the dispute. We believe, at a minimum, the claimant should be informed of or have access to the evidence on which the carrier relied in reaching its initial decision to deny the claim and, within a reasonable time thereafter, an opportunity to present evidence (in oral or written form) in support of his or her position. Where factual issues involving the credibility or veracity of the claimant are at stake, particular consideration of a policy granting on request an oral interview before the final denial on reconsideration should be given. At some point after the hearing, the claimant should receive a meaningful explanation of the reasons for whatever action is taken on the claim.

We are convinced that simplified, streamlined, informal oral procedures are available which would be responsive to the concerns of Congress for efficiency and low cost yet which would provide claimants with the right to participate in decisions affecting their interests in cases where such participation is critical. We are also convinced that the size of that class of cases can be reduced by remedying other defects in the decisionmaking process, such as the lack of adequate notice.[55] In order to formulate an

---

**55.** We have previously noted our concern over the inadequacy of the notice provided to claimants; we suspect that if a more helpful and thorough notice of the basis for denial were provided, many disputes could be resolved at an earlier stage. Better notice would also per- mit the agency to require, prior to providing an oral hearing, even as do courts, some preliminary showing by the claimant that in fact a factual dispute exists and that the problem is not due simply to a misunderstanding of Medicare benefits and how they are calculated.

order which will meet both the dictates of due process and the concerns of Congress, the court needs the assistance of the Secretary and Department, as well as the contribution of the plaintiffs. Thus we must remand this case for further proceedings. We have indicated above the minimum procedure which, on this record, must be afforded to the plaintiffs; we leave further formulation of the precise contours of the required due process hearing to the district court and the parties.

*Reversed and remanded.*