JOURNAL ENTRY AND OPINION
{¶ 1} Defendants-appellants, Morgan Stanley Dean Witter Financial Services, Inc. ("Morgan Stanley"), Linda Cain, Timothy Atkins, George Kohler, and Cindy DeLeo (collectively "appellants"), appeal from an October 6, 2006 judgment of the Cuyahoga County Court of Common Pleas, finding that plaintiff-appellee, Bruce W. Marks, was not bound by any arbitration provision, and denying their motion to *Page 3 
compel arbitration. For the following reasons, we affirm in part, reverse in part, and remand.
 {¶ 2} This is the second time appellants have filed an appeal in this case. See Marks v. Morgan Stanley Dean Witter Commercial FinancialServices, Inc., 8th Dist. No. 84209, 2004-Ohio-6419 ("Marks I"). Appellants previously appealed an order of the trial court in which they alleged that the trial court effectively denied their motion to compel arbitration and stay the proceedings. This court determined that the judgment was not a final appealable order because the trial court had not yet ruled on their motion to compel arbitration, and had only stayed the proceedings pending its decision on the motion to compel. Therefore, we dismissed the appeal. Id. at _14.
 {¶ 3} According to the record, Marks was employed by Morgan Stanley and its predecessor, Dean Witter Reynolds, Inc., as an investment account executive/financial advisor from June 1999 until his termination in May 2002. In June 2003, Marks filed a 15-count complaint against appellants, alleging several employment-related claims against Morgan Stanley and his supervisors. In Marks' second-amended complaint, he asserted claims of discrimination, breach of contract, promissory estoppel, unjust enrichment, fraud, intentional infliction of emotional distress, conversion, invasion of privacy, interference with business relationships, violation of securities laws, and defamation. He also sought declaratory judgment, an accounting, and the establishment of a constructive trust. *Page 4 
 {¶ 4} In July 2003, appellants filed a motion to compel arbitration, or in the alternative, to stay the proceedings.
 {¶ 5} In August 2003, Marks filed a separate complaint to enjoin arbitration of a claim for indemnification which Morgan Stanley had made against Marks in connection with a proceeding that a client had instituted against Morgan Stanley. In this complaint, Marks further sought a declaratory judgment regarding his right of access to the courts, and asked the court to disqualify Morgan Stanley's counsel. The trial court subsequently consolidated the two cases.
 {¶ 6} After this court dismissed Marks I, discovery on all issues continued
 {¶ 7} throughout 2005 and most of 2006.[1] The trial court denied appellants' motion to compel arbitration on October 6, 2006, stating, "[a]fter hearing and briefing at length on the issue of arbitration, this Court finds that the Plaintiff is not bound by any arbitration provision with the Defendant."
 {¶ 8} It is from this judgment that appellants timely appeal, raising a single assignment of error:
 {¶ 9} "The trial court erred in refusing to compel Appellee to arbitrate his claims because several valid and enforceable arbitration agreements existed between Appellee and Appellants." *Page 5 
 STANDARD OF REVIEW {¶ 10} In Shumaker v. Saks, Inc., 163 Ohio App.3d 173, 2005-Ohio-4391, this court explained the following about the standard of review in this matter:
 {¶ 11} "Initially, we note that this court does not agree upon the standard of review applicable to a trial court's decision denying a stay of proceedings and referral to arbitration. Several panels have held that questions regarding whether the parties have made an agreement to arbitrate is a question of law requiring de novo review, while others have held that the appropriate standard is whether the trial court abused its discretion in rendering its decision. See, e.g., Vanyo v.Clear Channel Worldwide (2004), 156 Ohio App.3d 706, 2004-Ohio-1793;Ghanem v. Am. Greeting Corp., [8th Dist.] No. 82316, 2003-Ohio-5935;Herman v. Ganley Chevrolet, Inc., [8th Dist.] Nos. 81143 81272, 2002-Ohio-7251; Spalsbury v. Hunter Realty, Inc. (Nov. 30, 2000), [8th Dist.] No. 76874, 2000 Ohio App. LEXIS 5552; Gibbons-Grable Co. v.Gilbane Bldg. Co. (1986), 34 Ohio App.3d 170 (holding that the question of whether a party has agreed to submit an issue to arbitration is a question of law requiring de novo review). Cf. Bevan v. Owens-Illinois,Inc., [8th Dist.] No. 84776, 2005-Ohio-2323; Strasser v. Fortney Weygandt, Inc., [8th Dist.] No. 79621, 2001 Ohio App. LEXIS 5738;Sikes v. Ganley Pontiac Honda (Sept. 13, 2001), [8th Dist.] No. 79015, 2001 Ohio App. LEXIS 4065 (holding that the appropriate standard of review is abuse of discretion)." Id. at _6. *Page 6 
 {¶ 12} The Shumaker panel went on to hold that "[u]nder either standard, we find that the trial court did not err in denying appellants' motion." Id. Since Shumaker was decided, this court has cited it six times regarding the standard of review on a motion to compel or motion to stay. In five of the six cases, this court noted the conflict, followed Shumaker, and held that under either standard, the trial court erred or did not err. See Bluford v. Wells Fargo Fin. Ohio1, Inc., 8th Dist. No. 89491, 2008-Ohio-686; Melia v. OfficeMax N. Am.,Inc., 8th Dist. No. 87249, 2006-Ohio-4765; Handler v. Southerland CustomBldrs., Inc., 8th Dist. No. 86956, 2006-Ohio-4371; Olah v. GanleyChevrolet, Inc., 8th Dist. No. 86132, 2006-Ohio-694; Dillard v. FifthThird Bank, 8th Dist. No. 86004, 2005-Ohio-6341.
 {¶ 13} In one of the six citing cases, Complete Pers. Logistics, Inc.v. Patton, 8th Dist. No. 86857, 2006-Ohio-3356, the panel set forth the following on the standard of review: "appellants contend the court erred by holding that this dispute was not arbitrable pursuant to the parties' agreement. Construction of the parties' contract is a question of law which we review de novo." The panel then cited Shumaker as a case to compare its standard of review with and explained in a parenthetical that Shumaker "suggested] a conflict as to the standard of review." Id. at _11.
 {¶ 14} We follow Shumaker and the majority of cases from this district which have also followed Shumaker and hold that under either standard of review, the trial court erred when it denied appellants' motion to compel arbitration. *Page 7 
 THE OHIO ARBITRATION ACT {¶ 15} Ohio and federal courts encourage arbitration to settle disputes. ABM Farms Inc. v. Woods (1998), 81 Ohio St.3d 498, 500. We are mindful of the strong presumption in favor of arbitration as an efficient and economical alternative dispute mechanism. Schaefer v.Allstate Ins. Co. (1992), 63 Ohio St.3d 708, 712. An arbitration clause in a contract is generally viewed as an expression that the parties agreed to arbitrate disagreements within the scope of the arbitration clause and with limited exceptions, an arbitration clause is to be upheld just as any other provision in a contract should be respected.Council of Smaller Enterprises v. Gates, McDonald Co. (1998),80 Ohio St.3d 661, 668. However, parties cannot be compelled to arbitrate a dispute in which they have not agreed to submit to arbitration.Piqua v. Ohio Farmers Ins. Co. (1992), 84 Ohio App.3d 619, 621; St.Vincent Charity Hosp. v. URS Consultants, Inc. (1996),111 Ohio App.3d 791, 793; Shumaker, supra.
 {¶ 16} Chapter 2711 of the Ohio Revised Code authorizes direct enforcement of arbitration agreements through an order to compel arbitration pursuant to R.C. 2711.03, and indirect enforcement of such agreements pursuant to an order staying trial court proceedings under R.C. 2711.02. Maestle v. Best Buy Co., 100 Ohio St.3d 330,2003-Ohio-6465, at _14. A party may choose to move for a stay, petition for an order to proceed to arbitration, or seek both. Id. at _18. InMaestle, the Ohio Supreme Court made it clear that a motion to compel arbitration and a motion to stay *Page 8 
proceedings are separate and distinct procedures which serve different purposes. Id. at _17.
 {¶ 17} Under R.C. 2711.02(B), "[i]f any action is brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon beingsatisfied that the issue involved in the action is referable toarbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement * * *." (Emphasis added.)
 {¶ 18} R.C. 2711.03(A) provides in pertinent part that a party "may petition * * * for an order directing that the arbitration proceed in the manner provided for in the written agreement. * * * The court shall hearthe parties, and, upon being satisfied that the making of the agreement for arbitration or the failure to comply with the agreement is not inissue, the court shall make an order directing the parties to proceed to arbitration in accordance with the agreement." (Emphasis added.)
 {¶ 19} Under R.C. 2711.03(B), "[i]f the making of the arbitrationagreement or the failure to perform it is in issue in a petition filed under division (A) of this section, the court shall proceed summarily tothe trial of that issue. If no jury trial is demanded as provided in this division, the court shall hear and determine that issue. * * * Upon the party's demand for a jury trial, the court shall make an order referring the issue to a jury called and impaneled in the manner provided in civil actions." (Emphasis added.) *Page 9 
 NECESSITY OF A HEARING ON A MOTION TO COMPEL ARBITRATION {¶ 20} In Maestle, the Ohio Supreme Court held that a trial court is not required to conduct a hearing when a party moves for a stay pursuant to R.C. 2711.02, but may stay proceedings "upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration * * *." Id. at 18. The high court reasoned, "the statute does not on its face require a hearing, and it is not appropriate to read an implicit requirement into a statute." Id.
 {¶ 21} Pursuant to R.C. 2711.03, however, where a party has filed a motion to compel arbitration, the court must, in a hearing, make a determination as to the validity of the arbitration clause.Maestle at _18.
 {¶ 22} As this court stated in McDonough v. Thompson, 8th Dist. No. 82222, 2003-Ohio-4655, we have consistently held that a hearing is mandatory on a motion to compel arbitration in order to determine the validity of the arbitration clause. Id. at _8 (referencing several cases). See, also, Post v. Procare Automotive Serv. Solutions, 8th Dist. No. 87646, 2007-Ohio-2106; Benson v. Spitzer Mgt, Inc., 8th Dist. No. 83558, 2004-Ohio-4751; Herman v. Ganley Chevrolet, Inc., 8th Dist. Nos. *Page 10 
81143 and 81272, 2002-Ohio-7251; Olah v. Ganley Chevrolet, Inc., 8th Dist. No. 86132, 2006-Ohio-694; Samoly v. Landry, 8th Dist. No. 89060,2007-Ohio-5707.[2]
 {¶ 23} In McDonough at _11-13, this court explained the statutory and procedural requirements under R.C. 2711.03:
 {¶ 24} "R.C. 2711.03 clearly provides that when the validity of the arbitration clause is itself at issue the trial court is required to conduct a hearing to determine the legitimacy of the arbitration clause being challenged. * * *
 {¶ 25} "Even though R.C. 2711.03 does not necessarily require the trial court to conduct a trial, it must, nonetheless, proceed summarily to trial when it finds that the validity of the arbitration agreement is in issue and the party challenging it has sufficient evidence supporting its claim.
 {¶ 26} "`When determining whether a trial is necessary under R.C.2711.03, the relevant inquiry is whether a party has presented sufficient evidence challenging the validity or enforceability of the arbitration provision to require the trial court to proceed to trial before refusing to enforce the arbitration clause.'"
 {¶ 27} In Molina v. Ponsky, 8th Dist. No. 86057, 2005-Ohio-6349, this court stated "[i]n enforcing motions to compel arbitration under R.C.2711.03, the trial court must engage in a two-step process. First, the court is mandated to hold a *Page 11 
hearing to determine whether the validity of the arbitration provision is in issue in the case at hand. Second, if the court finds this is an issue, It shall proceed summarily to the trial.'" Id. at _13, quoting R.C. 2711.03(B); see, also, Dunn v. L M Bldg., Inc. (Oct. 26, 2000), 8th Dist. No. 77399, 2000 Ohio App. LEXIS 4954, at 9.
 {¶ 28} Although a number of districts have also held that an initial oral hearing is necessary under the mandates of R.C. 2711.03, some courts have disagreed.
 {¶ 29} In Liese v. Kent State Univ., 11th Dist. No. 2003-P-0033,2004-Ohio-5322, the Eleventh District, after citing to R.C. 2711.03, stated that "[a] trial court is thus required to hear the parties to determine if the issue is subject to an arbitration agreement. The court defined "hearing" as "`any confrontation, oral or otherwise, between an affected individual [and a decisionmaker] sufficient to allow the individual to present the case in a meaningful manner. Hearings may take many forms, including a "formal," trial-type proceeding, an "informal discuss(ion)" * * *, or a "paper hearing," without any opportunity for oral exchange.'" Id. at fn.6, quoting Gray Panthers v. Schweiker(C.A.D.C, 1980), 209 U.S. App. D.C. 153, 652 F.2d 146, fn.3.
 {¶ 30} The Eleventh District then noted that "appellant never requested an oral hearing on the matter." Id. at _43. Both parties had moved for summary judgment and had submitted briefs on the issue of arbitrability. The court held that "[although an oral hearing was never conducted, the non-oral hearing [on the motions for *Page 12 
summary judgment] allowed the parties to be heard, as required by R.C. 2711.03." Id. at _45.
 {¶ 31} In Church v. Fleishour Homes, Inc., 172 Ohio App.3d 205,2007-Ohio-1806, the Fifth District explained, "[a]s an initial matter, we note that [appellants] never requested an oral hearing on the matter in the trial court. Nor did the [appellees] request a jury trial in their response to [appellants'] motion. We further note that neither party argue in this appeal that the trial court erred by failing to conduct a trial, or an oral hearing prior to ruling in this matter. Nor does either party contend that they were not able to fully develop their respective cases concerning the arbitration clause by the trial court's consideration of the respective briefs and evidentiary material submitted by the parties." Id. at _27.
 {¶ 32} The Fifth District reasoned that as a general rule, "the doctrine of waiver is applicable to all personal rights and privileges, whether secured by contract, conferred by statute, or guaranteed by the Constitution. As such, it is well-settled that a person may waive rights and privileges secured by statute, including the statutory right to a hearing conferred by R.C. 2711.03." (Citations omitted.) Id. at _30.
 {¶ 33} The Fifth District then held, "[i]t is therefore clear that the parties waived their right to a trial and/or an oral hearing by neither requesting the trial court conduct one nor objecting to the manner in which the trial court proceeded to resolve the *Page 13 
matter. In the same instance, however, the parties allowed themselves to be heard on the issue, as was required by R.C. 2711.03. The trial court conducted a non-oral hearing on [appellants'] motion to enforce the arbitration agreement on approximately July 5, 2006. Although an oral hearing was never conducted, the non-oral hearing allowed the parties to be heard, as required by R.C. 2711.03." (Citations omitted.) Id. at _31.
 {¶ 34} In Pyle v. Wells Fargo Financial, 10th Dist. No. 04AP-6,2004-Ohio-4892, the Tenth District noted that there seemed "to be some support for the interpretation that the `shall hear the parties' language in R.C. 2711.03(A) * * * mandates an initial oral hearing in every case." Id. at _18. However, the court chose not to decide that issue because it had already determined "that `the making' of the arbitration agreement was sufficiently put `in issue' as to require a trial" under R.C. 2711.03(B).[3] Id.
 {¶ 35} In this case, the trial court did not hold an oral hearing on appellants' motion to compel arbitrastion. The trial court set the matter for a hearing several times, including August 24, 2005 and September 29, 2005, but continued it each time. On November 14, 2005, the trial court issued an order stating "no testimony *Page 14 
was taken on 9-29-05 and this court will instead decide the issue of arbitration based upon the parties' briefs."
 {¶ 36} It is not clear how or why the trial court arrived at the decision to decide the matter on the parties' briefs and not hold an oral hearing.[4] It is patently clear, however, that neither party requested a jury trial or an oral hearing on the matter, nor did they object to the trial court deciding the matter only upon the evidentiary briefs. In addition, neither Marks, nor appellants, raise this issue on appeal.
 {¶ 37} Although the trial court did not hold an oral hearing on appellants' motion to compel arbitration, it did afford the parties an opportunity to conduct discovery and brief the issue of the validity of the arbitration clauses. In fact, discovery took place throughout 2005 and most of 2006. Marks and appellants also filed extensive evidentiary briefs on the issue. After considering the evidence before it, the trial court denied appellants' motion to compel. *Page 15 
 {¶ 38} We agree with how the court in Eagle v. Fred Martin MotorCo., 157 Ohio App.3d 150, 2004-Ohio-829, disposed of the issue regarding the hearing — or lack thereof — on a motion to compel arbitration:
 {¶ 39} "Although the trial court did not properly dispose of the motion to compel arbitration by not holding a hearing on the matter, the trial court did afford Ms. Eagle the opportunity to conduct discovery and brief the issue of the validity of the arbitration clause, pursuant to which the court issued an order addressing the arbitration clause. * * * Thus, on this ground we proceed to evaluate the arbitration clause, rather than ordering the trial court to hold a hearing * * *. While we do not intend to contradict the mandate in R.C. 2711.03 to hold a hearing on a motion to compel, we feel that at this point in this particularcase it is unnecessary to hold a hearing on the matter." (Emphasis added in part.) Id. at 22-23.
 {¶ 40} Although we still agree with our prior holdings that an evidentiary hearing is mandatory on a motion to compel arbitration, we conclude that in the case at bar, a hearing was not necessary. Based on the amount of evidence that was before the trial court in thisparticular case, at this point in time, namely five years after Marks filed the suit, after years of discovery, depositions, interrogatories, and documentary evidence, the trial court could adequately determine the issue upon the parties' briefs. Therefore, rather than remand this case and instruct the trial court to hold a hearing, this court will evaluate the arbitration clauses and determine if the *Page 16 
trial court erred when it found that Marks' claims were not covered under either of them.
 ARBITRATION CLAUSE IN EMPLOYMENT AGREEMENT {¶ 41} Appellants argue that the trial court erred when it did not compel arbitration because Marks agreed to arbitrate any claims that he had against Morgan Stanley in two separate agreements: the Account Executive Employment Agreement ("employment agreement") and the Uniform Application for Securities Industry Registration or Transfer ("FormU-4"). This court will address these arguments separately.
 {¶ 42} Marks and Morgan Stanley entered into an employment agreement on June 15, 1999. The employment agreement contained the following arbitration provision:
 {¶ 43} "Any controversy or claim arising out of or relating to thisAgreement, or its breach, will be settled by arbitration before either the National Association of Securities Dealers, Inc. ["NASD"[5] ] or the New York Stock Exchange, Inc. ["NYSE"] as Dean Witter may elect, in accordance with their respective rules, and judgment upon the award entered by the arbitrator(s) may be entered in any court having *Page 17 
jurisdiction thereof. Employee agrees to stipulate, upon request by Dean Witter, to expedited hearing procedures for such arbitration. This paragraph will not be deemed a waiver of Dean Witter's right to injunctive relief as provided for in paragraph 3 of this Agreement." (Emphasis added.)
 {¶ 44} Appellants argue that since any doubts regarding the scope of an arbitration agreement should be resolved in favor of arbitration, the arbitration clause here should be construed to cover all of Marks' claims against them. Marks maintains that the arbitration clause in the employment agreement only covers disputes "that arise out of the employment agreement, which only addresses unfair competition and confidential information. Therefore, this court must review the employment agreement and the provisions within it to determine the scope of the arbitration clause.
 {¶ 45} The employment agreement consists of two pages. The first page encompasses three sections labeled: "Customer Lists and Other Confidential Information," "Unfair Competition," and "Right to Injunction."
 {¶ 46} "Customer Lists and Other Confidential Information" has five subsections. Each one deals exclusively with Morgan Stanley being the sole owner of "[a]ll records and documents concerning the business and affairs" of the company, giving Morgan Stanley the authority to reclaim any "[c]ompany [r]ecords in the [e]mployee's possession or control" at "the time of termination of employment," *Page 18 
and instructing Marks "not [to] divulge to any person any information received during the course of his employment."
 {¶ 47} "Unfair Competition" sets forth a period of time upon Marks' termination of employment, when Marks cannot "solicit, directly or indirectly, any of [Morgan Stanley's] customers who were served by or whose names became known to" him during his employment. This section also prevents Marks from recruiting or soliciting employees of Morgan Stanley for "employment with any other organization which does business in securities, commodities, * * * or any other line of business" of which Morgan Stanley is engaged.
 {¶ 48} "Right to Injunction," gives Morgan Stanley the right to file an injunction against Marks "[i]n the event [he] breaches any of the promises" contained in the confidential information and unfair competition sections. This section further provides that if Morgan Stanley files an injunction, it does not waive its right to arbitration set forth in the agreement.
 {¶ 49} After review, there is no question that the first three sections of the employment agreement only address issues relating to confidential information and unfair competition.
 {¶ 50} Page two of the employment agreement includes eight short sections. In five of these sections, Marks agreed to the following provisions: to indemnify and hold Morgan Stanley harmless "against any and all losses or liabilities incurred by *Page 19 
the firm" in the event Marks breaches the agreement ("Hold Harmless"); that Morgan Stanley's "failure to enforce a breach" does not constitute of a waiver ("Waiver"); that Ohio law will govern the agreement in the event of a dispute ("Governing Law"); that if any section is declared void, then "the remainder of the Agreement will still continue and remain in full force and effect ("Severability"); and that the benefits of the agreement will run to Morgan Stanley's successors ("Successors").
 {¶ 51} The remaining three provisions on page two include the "Arbitration" provision, as well as "Termination of Employment" and "Entire Agreement." The "Termination of Employment" section provides that "[t]he Employee's employment by [Morgan Stanley] may be terminated by either party at any time with or without cause." The "Entire Agreement" section states "[t]his writing constitutes the entire agreement of the parties with respect to the subject matter herein. This agreement may be amended only by a writing signed by both the Employee and [Morgan Stanley]."
 {¶ 52} Appellants maintain that these three sections regarding arbitration, termination, and entire agreement, show that Marks agreed to arbitrate all claims against Morgan Stanley. Specifically, they argue that the arbitration provision "applies directly to the `Termination of Employment' section" and that a broad *Page 20 
reading of the arbitration provision "requires that all claims proceed to arbitration because they all relate to [Marks'] termination of employment." We disagree.
 {¶ 53} The arbitration provision states unequivocally that any controversy arising out of or relating to this Agreement, or itsbreach shall be settled by arbitration. A thorough review of the agreement in its entirety reveals that the substantive issues in the employment agreement relate only to unfair competition and confidential information. In the "Termination of Employment" provision, it defines "termination" for purposes of protecting Morgan Stanley's confidential information and customer lists — in the event Marks employment is severed from Morgan Stanley for any reason. Thus, any dispute arising out of issues relating to these two matters shall be settled by arbitration as set forth in the arbitration clause. Marks clearly did not agree to arbitrate all of his employment claims when he signed this agreement.
 {¶ 54} Accordingly, the trial court did not err when it denied appellants' motion to compel arbitration with respect to the arbitration provision in the employment agreement.
 ARBITRATION CLAUSE IN THE FORM U-4 {¶ 55} It is undisputed that at the beginning of his employment at Morgan Stanley, Marks executed a Form U-4.[6] Representatives of broker-dealers, *Page 21 
investment advisors, or issuers of securities must use this form to become registered in the appropriate jurisdictions and self-regulating organizations ("SRO").[7]
 {¶ 56} The Form U-4 had the following arbitration provision:
 {¶ 57} "I agree to arbitrate any dispute, claim, or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under these rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction."
 {¶ 58} Item 10 on the Form U-4 lists ten SROs, including the American Stock Exchange ("ASE"), the Chicago Board Options Exchange ("CBOE"), the NASD, NYSE, the Pacific Stock Exchange ("PSE"), and the Philadelphia Stock Exchange ("PHLX"). Item 10 also lists fifty-two "jurisdictions," consisting of the fifty states, the District of Columbia, and Puerto Rico. Item 11 on the Form U-4 sets forth the "type of examination/registration requested," such as "S-7 (GS) Full Registration/General *Page 22 
Securities Representative,"[8] "S-62 (CS) Corporate Securities Representative," or "(AG) Agent."
 {¶ 59} Marks did not check any of the SROs or jurisdictions listed in Item 10, nor did he indicate which type of registration he was seeking in Item 11. Marks maintains that because he did not check any of the boxes in Item 10, he did not agree to arbitrate any of his claims against Morgan Stanley "under the rules of the organizations in Item 10" when he signed the Form U-4.
 {¶ 60} Chapter XX of Morgan Stanley's Compliance Manual, is entitled "Registration and Licensing." The "Introduction" explains, "[t]his chapter provides the registration requirements that Morgan Stanley DW, Inc. Financial Advisors and other sales employees must meet in order to transact securities business and the titles they may use in presenting themselves to the public."
 {¶ 61} Pursuant to its Compliance Manual, as well as federal law, Morgan Stanley required financial advisors to be Series 7 registered. Further, any employee "who engages in the sale and/or solicitation of securities and futures, the solicitation of client accounts, and the giving of investment advice, must first be properly *Page 23 
registered with all appropriate regulatory bodies." To register with SROs, the employee must complete a Form U-4, which is then filed by Morgan Stanley. "Failure to comply with the applicable registration requirements could subject the Company and its employees (both registered and non-registered) to suspension or revocation of their right to engage in securities activities within a particular jurisdiction, as well as other disciplinary action."
 {¶ 62} According to the Compliance Manual, when experienced financial advisors begin employment at Morgan Stanley, they are required to "transfer their registration and licenses from their previous employer." If the experienced employees meet certain criteria, then the "most expedient method" to transfer their registration is by a "Temporary Agent Transfer" ("TAT"), which is accomplished by completing and filing a Form U-4.
 {¶ 63} Finally, the Compliance Manual sets forth instructions on how to complete the Form U-4. The applicant instructions for Item 10 require the employee to "[p]lace `X' in ASE, CBOE, NASD, NYSE, PHLX, and PSE boxes." Under Item 10's "state licencing" section, the instructions indicate that the applicant should "[p]lace `X' in the box for the state in which the applicant's branch is located." The applicant may also check other states if approved by the branch manager. And under Item 11, "type of registration," the instructions provide that the applicant *Page 24 
should check the S-7 box for full registration as a general securities representative (GS), as well the box to be an agent (AG).
 {¶ 64} Helen Dachtler, manager of Morgan Stanley's National Registration Department, testified in her deposition that she had worked for the firm for 18 years. She explained that the Form U-4 is used to process a new employee "through the NASD system in order to transfer the license of the individual from one broker dealer to another." She stated that an employee cannot work at Morgan Stanley and sell securities without being registered with the NASD.
 {¶ 65} She explained that when a new hire was previously registered at another firm, that employee could get a TAT. In order to do so, she said the employee had to have "a clean record, no disclosable items, that [he or she] left one firm and came into another within seven days, [and] that [the] new firm would notify the old firm that [the employee was] now a member of the new firm." If the employee met the TAT criteria, Dachtler explained that the NASD would then electronically transfer his or her license immediately and the employee could begin trading immediately. However, the NASD required a hard, signed copy of the Form U-4 within 15 days or the temporary license would become inactive.
 {¶ 66} She stated that the TAT process entailed a new hire filling out the Form U-4 and signing it. The branch manager would then keep a copy, and forward the original to the National Registration Department. She said that if the form came to her department unsigned, it would be sent back to the branch manager to have the *Page 25 
employee sign it. If the form had other deficiencies, however, the department would complete the form — unless it was a matter that "would change the integrity of the documentation."
 {¶ 67} Dachtler further explained that prior to beginning employment at Morgan Stanley, an employee must give the company his or her CRD number, along with permission to look at his records at the CRD to find out if "there's anything reportable, if [he] was properly registered, if he had taken exams."[9] She explained that as a member of the NASD, Morgan Stanley had the authority to use the CRD to investigate prospective employees. She said that each firm and each individual is assigned a CRD number, which is "like a Social Security number. You get one. And it's with you your entire life as a registered individual."
 {¶ 68} Dachtler testified that Marks had given Morgan Stanley permission to view his history prior to his employment. She then identified Marks' "prehire consent form." She read from the first paragraph of the consent: "I, Bruce Marks, formerly with Ladenburg Thalmann, hereby give my consent for Morgan Stanley Dean Witter, Inc. to verify my previous employment and registration history through the central registration depository, CRD, system." She stated that it was signed by Marks and dated January 19, 1999. *Page 26 
 {¶ 69} Dachtler explained that she did not personally handle the filing of Marks' Form U-4. However, it would have been standard protocol for someone in her department to check the boxes in Item 10 as to what "exchanges and the states that he had." She said that her department would check those boxes "so we can do business." She explained, "we had done a prehire on this individual. We knew where he was registered and what he needed, what he wanted." She further stated that she knew her firm had sent a hard, signed copy to the NASD within the required 15 days, or Marks would not have been able to work at Morgan Stanley. She admitted, however, that she could not produce the signed, hard copy of the completed Form U-4 because Morgan Stanley's records had been destroyed in the World Trade Center on September 11, 2001.
 {¶ 70} The record clearly demonstrates that Marks needed to be registered with the NASD in order to conduct business as a financial advisor at Morgan Stanley. The question remains, however, whether he actually was registered. Marks contends that he was not a registered member of the NASD because he is not bound by these "after-the-fact unconsented to alterations" on the Form U-4 that were completed without his "knowledge, authorization, or consent," by some unknown Morgan Stanley employee and then submitted to the NASD by some other unidentified person at Morgan Stanley. *Page 27 
 {¶ 71} Marks further argues that this information, obtained through the deposition of Helen Dachtler, was merely "opinions offered by a non-expert fact witness." He contends, "[t]he vast majority of the statements made by Ms. Dachtler, a high school graduate who held no broker's license, who was never employed by the NASD, the New York Stock Exchange (NYSE) or any other Self-Regulatory Organization, and who was neither an attorney nor an industry expert, constitute opinion testimony, as she admitted in her deposition." Marks maintains that her "opinions" were not admissible under Evid.R. 701. We disagree.
 {¶ 72} As manager of the National Registration Department, Dachtler was in the best position to testify about Morgan Stanley's compliance and registration protocol and procedures. She did not testify as an expert on federal securities law or requirements. She testified to Morgan Stanley's procedures regarding registration. She did not need a broker's license or law degree to do so.
 {¶ 73} The facts in Hickman v. PaineWebber Inc. (E.D.Tex 1995), Case No. 1:96-CV-0273, 1996 U.S. Dist. LEXIS 13196, are identical to the facts in the case sub judice. An employee-broker of PaineWebber signed a Form U-4, but did not complete Item 10 on the Form U-4. PaineWebber completed the form and registered the employee with the NASD. By executing the Form U-4, the court held that the employee gave PaineWebber the "express right * * * to complete and amend question 10 of the U-4 Form." Id. at 9-10. The court reasoned that the employee *Page 28 
"[could] not complain that he was unaware that PaineWebber had the express right under the U-4 Form, as well as under agency law, to complete and amend question 10 of the U-4 Form." Since the employee was registered as a member of the NASD, he was required to arbitrate his claims against PaineWebber. Id.
 {¶ 74} In Brown v. Merrill, Lynch, Pierce, Fenner Smith, Inc.
(E.D.Pa. 1987), 664 F.Supp. 969, the employee-broker executed a Form U-4 at the beginning of her employment. She claimed that she intentionally left question 8 (of a 1982 U-4 Form) blank, indicating that she "did not wish to fall within the jurisdiction of the constitutions or by-laws of any SRO listed on the U-4 Form." Id. at 972. The court held that it could not compel arbitration since it was clear that on the Form U-4, the employee had not "sought registration with any SRO." Nevertheless, the court noted that if the employee had been "registered with the NYSE, ASE or NASD during employment," she "would [have been] subject to the arbitration provisions." Id. However, the court stated that it was "unable to draw this conclusion based on the record before [it]." Id.
 {¶ 75} In In re Bradford (E.D.Tenn. 1995), 181 B.R. 910, the prospective employee had accepted a position with J.C. Bradford as a broker-trainee in early December 1993. The employee filed a chapter 7 bankruptcy in late December 1993. The employee reported to work in January 1994, signed a broker-trainee agreement and a Form U-4, but did not check any of the boxes in Item 10. J.C. Bradford fired the employee later that same day. *Page 29 
 {¶ 76} The employee in Bradford argued that he was not subject to arbitration because he did not check any of the boxes in Item 10. The court agreed with the employee that he did not have to arbitrate, but not because he did not choose a SRO in Item 10. The court stated that "[w]hen [the employee] signed the U-4, he gave J.C. Bradford the authority to complete it and file it." Id. at 913. The court pointed out, however, that because "J.C. Bradford fired [the employee] before it completed and filed the U-4," the employee "remained a stranger to the member organizations." Id. at 914. The court explained, "[t]he critical question is whether the U-4 made [the employee] a party to the membership agreement" of any of the SROs. Id.
 {¶ 77} After reviewing the federal cases addressing this exact matter, we conclude that when Marks executed the Form U-4, he implicitly gave Morgan Stanley the authority to complete Item 10 and Item 11, so that it could properly register him with the appropriate SROs as a securities broker.
 {¶ 78} The NASD rules require individuals associated with a broker-dealer to be a registered member of the NASD. Morgan Stanley, in order to comply with federal law, requires its employees to be properly registered. The securities industry is a highly regulated and specialized industry. Marks himself maintained that he "was a successful and coveted financial planner and advisor." He testified that he had a Bachelor of Science degree in business administration, a Juris Doctorate degree, and a Masters of Business Administration. He was also a Certified Financial *Page 30 
Planner and had at one time, been admitted to the Ohio and Florida bars. Thus, Marks cannot seriously contend that he did not know that by executing the Form U-4, Morgan Stanley had the authority to — and would — properly register him so that he could conduct business as a broker while employed there.
 {¶ 79} The critical issue in the case at bar then is not whether Morgan Stanley could complete Item 10, but whether it actually did and then, whether it properly filed the form. It is conceivable that Morgan Stanley could have inadvertently failed to file the form (since brokerage firms can be sanctioned by the NASD if individual brokers are not properly registered). Thus, this court must ultimately determinewhether Marks was registered with the NASD while he was employed at Morgan Stanley. If he was registered, however, then there is no question that he was subjected to the "rules, constitutions, or by-laws" of the NASD and as a result, would be required to arbitrate any of his claims that fall within the scope of the NASD arbitration rules.
 {¶ 80} In his deposition, Marks testified that he had passed the Series 7 exam to become licensed as a general securities representative and was subsequently licensed to sell securities. But he acted as if he had never heard of the NASD. He claimed that although he passed the Series 7 exam, he could not remember who gave the Series 7 exam. Further, he could not say who held his broker license, or if he had ever been registered with the NASD, or any other SROs. He could not even say if Morgan Stanley or any of his previous employers had to be registered with the NASD or NYSE. *Page 31 
 {¶ 81} In her deposition, Dachtler identified a document entitled, "Composite Information," which she printed directly from the CRD website immediately prior to her deposition on July 12, 2005.[10] Through this web site, which Morgan Stanley had privilege to use as a member, she was able to obtain Marks' "U-4 employment history." The "Registration Summary" showed Marks' previous employment, including what firm he worked for, the starting date, the ending date, and the firm's CRD number.
 {¶ 82} Under "Registration with Prior Employers," the document indicated that Marks was employed by Morgan Stanley from June 15, 1999 to May 30, 2002. The summary showed that while employed by Morgan Stanley, Marks was registered with the following "regulatory authorities" as a "GS" (general securities representative): "AMEX, CBOE, NYSE, NASD, PCX, and PHLX." He was also registered in eight states, including Ohio. The document further showed Marks' previous employers, what type of registration he had, and which SROs he had been registered with while employed with them.
 {¶ 83} In addition, after Dachtler's deposition, appellants moved for leave to file a "Supplement to Their Motion to Compel Arbitration." After the trial court granted their leave, appellants filed their supplement and produced a document that they claimed was a copy of the completed Form U-4. They explained that although *Page 32 
the original had been destroyed in the bombing of the World Trade Center, that they had obtained a copy of the completed form directly from the NASD.
 {¶ 84} On the top of the completed copy of the Form U-4, it was stamped "TAT" in large bold letters. In Item 10, the boxes ASE, CBOE, NASD, NYSE, PHLX, and PSE, were checked, as well as the boxes for five states, including Ohio. In Item 11, the boxes for "S-7 (GS) Full Registration/General Securities Representative" and an "(AG) agent" were checked. And in the lower right-hand corner of the first page, there was a box which indicated that its purpose was for "CRD USE ONLY," and the number "00075918099" was either stamped or typed in the box.
 {¶ 85} Marks argues that this belated "second and different version of the U-4 Form which contains a modified Item 10" was "purportedly from the NASD." He maintains that "[t]he document was offered without its authentication by the custodian of records from the NASD."
 {¶ 86} Marks may be correct that the completed Form U-4 was offered without authentication. Nevertheless, he did not object to the trial court granting appellants' motion for leave to file the supplemental information, nor did he move to strike the document. Thus, this court may consider the completed Form U-4 as part of the record on appeal. *Page 33 
 {¶ 87} After reviewing the record in its entirety, we conclude there is no question that Marks was registered with the NASD while he was employed at Morgan Stanley. The Composite Information printed from the CRD web site clearly showed that he was registered with the NASD, as well as several SROs, while employed at Morgan Stanley. Additionally, the copy of the completed Form U-4 obtained from the NASD shows that Marks received a TAT, which allowed him to immediately begin selling securities at Morgan Stanley. Marks would not have received the TAT if Morgan Stanley had not completed Items 10 and 11 on the Form U-4 and filed it with the CRD in order to properly register Marks. Having been so registered, he had no choice but to arbitrate all of his claims (with one exception as discussed below) claims against Morgan Stanley.
 {¶ 88} We agree with Marks that he does not have to arbitrate his employment discrimination claim.
 {¶ 89} As of January 1, 1999, Rule 10201(b) of the NASD's Code of Arbitration was amended. Haskins v. Prudential Ins. Co. of Am. (2000),230 F.3d 231, at fn. 1. It now provides, "a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose."
 {¶ 90} Appellants contend that despite this rule excluding employment discrimination, Marks agreed to arbitrate all claims in the employment agreement — *Page 34 
which would include discrimination. However, we already determined that Marks did not agree to arbitrate all employment claims when he signed the employment agreement. Therefore, Marks is only required to arbitrate his claims as a member of the NASD and under its rules, employment discrimination is excluded from arbitration without an express agreement to do so.
 {¶ 91} Thus, we conclude that the trial court did not err when it denied appellants' motion to compel arbitration with respect to the employment agreement or with respect to Marks' employment discrimination claim. The trial court did err, however, when it denied appellants' motion to compel arbitration as to the Form U-4, which required that Marks' remaining claims against Morgan Stanley be arbitrated. Appellants' sole assignment of error is overruled in part and sustained in part.
 {¶ 92} Accordingly, the judgment of the Cuyahoga County Court of Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
It is ordered that appellants recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 35 
CHRISTINE T. MCMONAGLE, J., CONCURS;
SEAN C. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY
[1] In a July 14, 2005 entry, the trial court issued the following order: "Plaintiffs motion, #1683771, filed 6-28-05, motion for order suspending plaintiff's duty to respond to defendant's discovery requests not related to arbitrability or disqualification of counsel, is hereby denied. Discovery shall proceed on all issues forthwith."
[2] This court has also consistently held that "parties should be afforded an evidentiary hearing on the validity of an arbitration clause where unconscionability is raised as an objection to its enforceability." See Post, supra, at _29. We cannot find anywhere in the record where Marks raises the issue of unconscionability.
[3] The dissenting judge in Pyle stated, "I do not join in the majority's suggestion that the Supreme Court of Ohio in [Maestle], held or implied that trial courts must always conduct an oral hearing when a motion is made pursuant to R.C. 2711.03, based upon that statute's language requiring the trial court to `hear the parties' on the issue of arbitrability." Id. at]}38 (Sadler, J., dissenting).
[4] In "Defendants' Post-Hearing Evidentiary Brief Supporting Their Motions to Compel Arbitration," filed on November 18, 2005, defendants stated: "On June 23, 2005, the Court set Defendants' Motion for hearing on August 24, 2005. This hearing date was later changed to September 29, 2005 by Court order. (See Journal Entries dated 6/23/05, 07/07/05 and 07/14/05). On September 29, 2005, the court determined an oral evidentiary hearing was unnecessary. * * * Defendants now submit this Brief which highlights for the Court the evidence which would have been presented in support of their Motion at the hearing on September 29." Although defendants claim "the Court set Defendants' Motion for hearing on August 24, 2005," it was actually defendants motion to compel arbitration that the court set for hearing on August 24, 2005, not its "motion for hearing." This court cannot find anywhere in the record where defendants requested a hearing on the matter.
[5] The NASD "was established in 1939 under the Securities and Exchange Act of 1934. The `34 Act requires virtually all broker-dealers to be registered with the NASD, placing brokers under the Securities and Exchange Commission's direct oversight and under the NASD's oversight. Until 2007, when it consolidated with NYSE * * * to create FINRA * * *, [the] NASD was the largest self-regulatory organization for the U.S. securities industry, and the world's leading private-sector provider of financial regulatory services." See www.finra.org (Resources).
[6] Marks did not date his signature. However, Timothy Adkins, who signed the Form U-4 on behalf of Morgan Stanley, dated his signature on 6-24-99. Although Marks mentions the fact that he did not date his signature, he admits that it is his signature on the form. Further, he does not claim that Timothy Adkins forged the date of his signing.
[7] Self-regulatory organization includes "any national securities or commodities exchange, any national securities association, or any registered clearing agency." See www.finra.org (Form U-4 Instructions).
[8] A "General Securities Representative Examination" is commonly called a Series 7 exam. The exam is an "entry-level examination that qualifies [an] individual for registration with all self-regulatory organizations[.]" An individual associated with a broker/dealer must register with the NASD and possess either a Series 7 or a Series 62 license to effect transactions in certificates of deposit (CDs) that are structured as securities. See NASD Membership and Registration Rules 1032(a) and 1032(e), General Securities Representative.
[9] CRD stands for Central Registration Depository. A CRD number is a "unique number" assigned to each firm or individual listed. Through an automated Web CRD system, the NASD (now FINRA) "maintains the qualification, employment and disclosure histories of the more than half a million registered securities employees of member firms." See http://www.finra.org (RegulatorySystems, CRD).
[10] The CRD "Composite Information" on Marks was also attached to appellants' Post-Hearing Evidentiary Brief Supporting Their Motion to Compel Arbitration. *Page 1